2018 IL App (1st) 160030
No. 1-16-0030
Opinion filed September 28, 2018

FOURTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Respondent-Appellee, | ) ) | |
| v. | ) ) | No. 00 CR 11338 |
| DANIEL RODRIGUEZ, | ) ) | The Honorable Thomas J. Byrne, |
| Petitioner-Appellant. | ) | Judge, presiding. |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice McBride specially concurred, with opinion.
Justice Burke dissented, with opinion.

**OPINION**

¶ 1     Defendant Daniel Rodriguez appeals from the second-stage dismissal of two of the claims in his petition for postconviction relief. A third claim in his petition proceeded to a third-stage evidentiary hearing. However, defendant does not appeal the dismissal of the third claim. Thus, procedurally, our review on appeal is as if the appeal were from a second-stage dismissal.

¶ 2     Defendant, who was 15 years old at the time of the offense, was tried as an adult and convicted by a jury of first degree murder in connection with the drive-by shooting of 18-

year-old Ricardo Vasquez on April 1, 2000. Additionally, the jury found that defendant personally discharged the firearm that proximately caused Vasquez's death. On December 28, 2006, defendant was sentenced to 45 years with the Illinois Department of Corrections (IDOC), which was the mandatory minimum sentence he could have received and which included a 25-year enhancement for personally discharging the firearm.

¶ 3     At the 2006 sentencing in this case, the trial court observed that defendant's 45-year sentence in the case at bar was required to run consecutively to a prior sentence. On June 9, 2005, defendant had been sentenced in an unrelated case to 20 years for attempted first degree murder. Defendant claims that, as a result, he will not be released until he is 83 years old.[1]

¶ 4     On this appeal, defendant makes two claims: (1) that he made a substantial showing of ineffective assistance of trial counsel because counsel failed to investigate an alibi witness and failed to call her to testify that defendant was at a gang meeting with her at the time of the shooting; and (2) that his case should be remanded for resentencing because *de facto* life imprisonment, imposed against a juvenile offender as the result of mandatory sentencing laws, violates the eighth amendment and the proportionate penalties clause. For the following reasons, we do not find his first claim persuasive, but we remand for resentencing.

¶ 5                                    BACKGROUND

¶ 6     In sum, the State's evidence at trial established that the murder of 18-year-old Vasquez was the result of a gang-related, drive-by shooting on April 1, 2000, at 9:20 p.m. on

---

[1]The State did not dispute this fact in its brief to this court. However, during oral argument before this court on August 9, 2018, the State asserted, for the first time, that defendant will be released at age 77. Oral argument is not the place to raise arguments for the first time. Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) ("Points not argued are waived and shall not be raised in *** oral argument ***."). However, as we discuss in greater detail below, whether defendant's release will be at age 83 or 77 does not alter the substance of our analysis.

South Escanaba Street in Chicago. Defendant was stopped by police a mile from the crime scene, only two hours later, in a vehicle that matched the description provided by eyewitnesses of the shooter's vehicle. At a show-up identification held on the street shortly after defendant was stopped, two eyewitnesses identified defendant as the shooter. Another eyewitness, although unable to identify the shooter, was able to identify defendant's vehicle as the shooter's vehicle. The parties stipulated that a gunshot reside test performed, shortly after the stop, on defendant's hands was positive for the presence of gunshot residue. In addition, another witness testified that defendant told him that defendant was seeking a gun because another gang had hit his vehicle.

¶ 7    This court already described in detail the evidence at trial when we reviewed this case on appeal. See *People v. Rodriguez*, 387 Ill. App. 3d 812 (2008). As a result, we will not repeat that level of detail here, and we incorporate our prior opinion by reference. We set forth below a description of the evidence at trial sufficient to understand the issues on this appeal.

¶ 8    At the trial, Carlos Luna testified that he was 25 years old and that, in 2000 when the shooting occurred, he was a member of the Latin Dragons gang. On April 1, 2000, the night of the shooting, he was standing with a group of friends, including six gang members, in front of a house on South Escanaba Avenue, when he observed a four-door grey Cadillac Sevilla approaching slowly with a driver and passenger. Luna approached the vehicle and was 15 feet away from it when the driver leaned back and the passenger opened fire, hitting Vasquez. Later that night, when Luna viewed a photo array at the police station, he was not able to identify either the driver or passenger of the vehicle.

¶ 9          Camelia Prado testified that she was 29 years old and that, in 2000, she was also a member of the Latin Dragons gang. She was on the porch of the house on South Escanaba Avenue, when she observed a Cadillac approaching slowly, with the driver's window down. The driver leaned back, and the passenger started shooting, hitting Vasquez. Prado called the police, and when they arrived, she provided a description of the vehicle. An hour later, Prado, Antoine Lacy and Joseph Gonzalez went to view defendant's vehicle, which she identified as the shooter's vehicle. However, she could not identify the shooter.

¶ 10          Gonzalez testified that he had been convicted of possession of a handgun and that, in 2000, he was a member of the Latin Dragons. On April 1, 2000, at 9:20 p.m., he was on the steps in front of a house on South Escanaba Avenue, when he observed a "short-body," four-door vehicle approach slowly, with a driver and one passenger. The driver leaned back, and the passenger, whom Gonzalez identified as defendant, fired shots, hitting Vasquez. After the police arrived, Gonzalez provided a description of both the shooter and the vehicle. Another 10 or 20 minutes later, the police asked him to travel to another location where he identified both the shooter and his vehicle. At the time of the identification, Gonzalez was sitting in the back seat of a vehicle with Prado and another individual, while the police shined a light on the suspect. On cross, Gonzalez admitted that he had lied when he testified in front of the grand jury that he was not a member of a gang.

¶ 11          Lacy testified that he was currently incarcerated due to felony convictions for aggravated assault and weapons possession and that, in April 2000, he was 17 or 18 years old and a member of the Latin Dragons. Lacy testified that, in 2000, the rivals of the Latin Dragons were the Latin Kings. On April 1, 2000, he was with a group of his friends, including the victim, Vasquez, whom Lacy described as "[o]ne of my gang-affiliated

4

friends." At 9:20 p.m., Lacy was standing on the sidewalk, when he observed a Buick or Cadillac approaching slowly. Lacy was 12 to 13 feet away from the vehicle when he looked into the vehicle and recognized the passenger because he had "seen him in the mall before." The passenger, whom Lacy identified as defendant, started firing through the driver's side window as the driver leaned back. Later the police informed him "that they had caught the shooter," and he traveled with Prado and Gonzalez to that location. Lacy identified the vehicle as the shooter's vehicle and defendant as the shooter. During the identification, the police placed defendant in front of their vehicle and focused their high beams on him.

¶ 12        Officer Edward Maras of the Chicago police department testified that on April 1, 2000, at 10:20 p.m., he was approximately a mile from the shooting when he observed defendant alone in a vehicle that matched the description of the shooter's vehicle. After Officer Maras stopped defendant's vehicle, he asked other officers to bring the witnesses to his location, and they subsequently conducted a show-up identification.

¶ 13        Prior to the testimony of Francisco Ortiz, defense counsel moved *in limine* to bar the State from asking Ortiz whether defendant was a member of the Latin Kings, which Lacy had already testified were the rivals of the Latin Dragons at the time of the shooting. The trial court ruled that, if the defense "open[ed] the door," then the trial court would permit the State to ask about defendant's gang affiliation.

¶ 14        When moving to bar defendant's gang membership, defense counsel argued:

> "Although it's not the next witness, the next witness after that is going to be a yound man by the name of Francisco Ortiz ***. One of the things I believe he may testify to is that [defendant] is a member of the Latin Kings. I would ask as an

*in limine* motion that Mr. Ortiz not be able to indicate that [defendant] is a member of the Latin Kings."

¶ 15     The State responded:

"We believe that it is relevant as the statement that [defendant] makes to Mr. Ortiz is that he was upset, blasting a rival gang for damaging his car; therefore, he wanted to take some sort of action against the rival gang and that he was speaking to a fellow gang member and asking him for a gun."

¶ 16     After listening to the attorneys for both sides, the trial court ruled:

"I really don't see any reason why you have to say that the defendant belongs to a gang. If there's anything, however, [defense counsel], on cross at all why [defendant] asked Mr. Ortiz for the gun, I'm going to let them know because they are gang members because you are putting something into the case."

¶ 17     The trial court further explained:

"[Defense counsel], if you elicit Mr. Ortiz is in a gang, I'm going to let the State elicit that—if [defense counsel] crosses Mr. Ortiz about him being in a gang or a gang member, then, of course, I'm going to allow the State to bring out the fact that the defendant is in a gang. That shows why he asked for something. If you open the door at all, I will let it in because it's absolutely completely proper."

The trial court emphasized to defense counsel: "If you open it, the State can step right in." The prosecutor then represented to the trial court that he had instructed Ortiz "not to mention he's in a gang and the defendant is in a gang."

¶ 18     Francisco Ortiz testified that he was currently incarcerated on four felony convictions and that, in April 2000, he was 15 years old and had known defendant for a year. On April 1,

2000, at 10 a.m. or noon, defendant visited Ortiz at Ortiz's home and asked if Ortiz had a gun. Defendant stated that he wanted a gun because "he wanted to take care of some business." Defendant explained that some Latin Dragons had hit his vehicle the night before and dented the passenger side. Ortiz specifically testified that he did not give defendant a gun. Ortiz also testified that defendant drove a Buick or Cadillac and identified photos of both defendant and defendant's vehicle.

¶ 19 The jury heard several stipulations, including a stipulation that a gunshot residue kit was administered to defendant's hands on April 1, 2000, at 11:40 p.m., approximately two hours after the shooting, and that a proper chain of custody was maintained of the kit at all times. The parties also stipulated that, after defendant was released on bond on June 4, 2001, for this case, he failed to appear and he was not apprehended until almost three years later, on February 19, 2004.

¶ 20 Scott Rochowicz, a forensic scientist with the Illinois State Police, testified that he had tested the gunshot residue recovered from defendant's hands on April 1, 2000, and that, in his opinion, to a reasonable degree of scientific certainty, the level of residue was "consistent with" defendant's "discharging a firearm, handling a firearm or being in close proximity to a firearm when it was discharged."

¶ 21 Adrienne Segovia, a deputy medical examiner with Cook County, testified that the victim, Vasquez, died from a bullet that pierced his arm, lungs, and heart.

¶ 22 On September 21, 2005, the jury found defendant guilty of both first degree murder and of having personally discharged the firearm that proximately caused Vasquez's death.

¶ 23 On November 1, 2005, defendant filed two posttrial motions for a new trial and included an affidavit from Francisco Ortiz recanting his trial testimony. Ortiz had testified at

trial that defendant had wanted a gun. The trial court held a posttrial hearing at which Ortiz testified. The trial court found Ortiz to be a "liar" and denied the motions.

¶ 24        On December 28, 2006, the trial court sentenced defendant to the minimum, which was 45 years with IDOC. The 45-year sentence included a 25-year enhancement for personally discharging the firearm proximately causing Vasquez's death, and it ran consecutively to a prior 20-year sentence for an unrelated attempted first degree murder conviction.

¶ 25        Defendant appealed, challenging the use of an Illinois pattern jury instruction and claiming that trial counsel was ineffective for failing to move to suppress the show-up identifications conducted immediately after defendant was stopped. This court did not find these claims persuasive and affirmed. *Rodriguez*, 387 Ill. App. 3d at 833.

¶ 26        On November 4, 2009, defendant filed a *pro se* postconviction petition with numerous claims. The petition advanced to the second stage of postconviction proceedings, where defendant received counsel. Defendant's counsel filed a supplemental petition asserting three claims: (1) that trial counsel was ineffective for failing to investigate Lucy Avila, an alibi witness, who would have testified that defendant was with her at a gang meeting at the time of the shooting; (2) that, because defendant was 15 years old at the time of the offense, his *de facto* life sentence was unconstitutional; and (3) that an affidavit from Lacy was newly discovered evidence showing that Lacy had falsely identified defendant as the shooter. The supplemental petition was supported by affidavits from both (1) Avila, the proposed alibi witness, and (2) Lacy, the recanting trial witness.

¶ 27        The trial court dismissed defendant's (1) ineffectiveness claim and (2) sentencing claim at the second stage. It is the dismissal of these two claims that defendant now contests

8

on this appeal. With respect to the ineffectiveness claim, the trial court found that it was a matter of trial strategy whether to avoid presenting evidence of defendant's gang membership.

¶ 28    In his *pro se* petition, defendant stated, under penalties of perjury, that he had discussed with his trial counsel whether to call Avila as an alibi witness and his counsel had responded: "I didn't think it was a good idea to present some young, Latina, female who would put you at a junta with some Latin Kings as an alibi defense. It would definitely get you convicted." Defendant stated that he agreed "because he thought trial counsel knew best."

¶ 29    Specifically, in his *pro se* petition, defendant had stated:

"During the time span in which [defendant] was incarcerated in Cook County Jail, trial counsel visited him briefly on two occasions: on 2/29/04 and 10/3/05. During these visits [defendant] discussed the fact that a person by the name of Lucy Avila had contacted one of his friends and told him that she was on 99th and Ewing when the murder occurred and that [defendant] was present also. Avila also informed [defendant]'s friend that she wanted to testify and wanted to be a witness for [defendant]. ***

[Defendant] not knowing this witness, informed trial counsel that Avila wanted to be contacted by her phone [number] or by sending someone to her residence.

The day trial commenced the trial court asked trial counsel if he was presenting an alibi defense. Trial counsel asked for a moment to speak with [defendant]. During this brief discussion [defendant] asked trial counsel about Avila. Trial counsel responded by saying, 'I didn't think it was a good idea to present some young, Latina, female

who would put you at a junta with some Latin Kings as an alibi defense. It would definitely get you convicted.'

Afterwards, [defendant] told [the] trial court that he did not have an alibi witness for [the] defense because he thought trial counsel knew best."

¶ 30    Defendant attached to his *pro se* petition an affidavit from Avila, stating in full:

"I, Lucy Avila, being first duly sworn state on [*sic*] oath, that if called to testify in the matter of People v. Rodriguez, No. 00-CR-11338, I would testify as follows:

1. That on the night of April 1, 2000, I was on 99th & Ewing [S]t., at the hours of 9:00 p.m.—10:30 p.m.[2]

2. During this time on this date I did not know [defendant] and had seen him for the first time ever on this date.

3. During the entire time I was on 99th & Ewing [S]t. I observed [defendant] present so he could not of [*sic*] committed the murder in the above case.

4. I did give [defendant]'s friend my phone [number] and address to have his lawyer contact me and discuss [defendant]'s alibi.

5. [Defendant]'s friend did tell me that he gave my information to [defendant]. And that [defendant] said his Lawyer would contact me soon.

6. I was never contacted by [defendant]'s lawyer or anyone else on behalf of [defendant]'s legal representation. Further affiant sayeth not."

¶ 31    The supplemental postconviction petition filed by counsel observed that Avila's affidavit was already attached to defendant's *pro se* petition, and the supplemental petition

---

[2]Officer Maras testified at trial that he arrested defendant at a different location at 10:20 p.m.

also attached an affidavit from defendant verifying the allegations in his *pro se* petition as true.

¶ 32    At the second-stage hearing, the following colloquy occurred concerning Avila and her proposed alibi:

"DEFENSE COUNSEL: As far as we're concerned, Judge, [defendant]'s allegations *** that he told the attorney about Avila, and Avila's affidavit that she was never contacted, so there was a potential alibi witness that was never really considered.

THE COURT: [Counsel], you agree or do you agree that had she been contacted, she would have said that [defendant] was at the junta, that he was at a gang meeting[?]

DEFENSE COUNSEL: Yes, Judge."

¶ 33    After listening to counsel's arguments at the second-stage hearing, the trial court observed, in part, with respect to Avila:

"The record makes it clear that it was clear to the trial attorney that this was an issue, that there was strategy involved here regarding whether it was beneficial to point out to a jury that [defendant] was with gang members, and therefore, could present people who were at the junta."

¶ 34    The trial court further observed that, even if trial counsel did not contact Avila, this did not

"change the nature of the defense that she would have presented, the nature of the alibi, which it was clear to me from the record, it is established by the record was a decision that was made as part of a strategy by [trial counsel], and it was signed onto by [defendant]."

11

¶ 35        After dismissing the claims at issue here at the second stage, the trial court held a third-stage evidentiary hearing on the sole remaining claim. The third claim was that Lacy's recantation affidavit was newly discovered evidence that would probably change the result at a retrial. At trial, Lacy had identified defendant as the shooter. At the evidentiary hearing, Lacy testified that he had not observed the shooter. On October 27, 2015, the trial court denied this claim, and this claim is not at issue on this appeal.

¶ 36        On November 18, 2015, defendant filed a notice of appeal, and this timely appeal followed.

¶ 37                                ANALYSIS

¶ 38        Defendant appeals the second-stage dismissal of the following two postconviction claims. First, he claims that he made a substantial showing of ineffective assistance of trial counsel where trial counsel failed to investigate an alibi witness and failed to call her to testify that defendant was at a gang meeting with her at the time of the shooting. Second, defendant claims that his case should be remanded for resentencing because *de facto* life imprisonment, imposed against a juvenile offender as the result of mandatory sentencing laws, violates the eighth amendment and the proportionate penalties clause. For the following reasons, we are not persuaded by his first claim, but we remand for resentencing.

¶ 39                        I. Stages of a Postconviction Petition

¶ 40        Under the Post-Conviction Hearing Act (Act), individuals convicted of a criminal offense may challenge their convictions if there was a violation of their constitutional rights. See 725 ILCS 5/122-1 *et seq.* (West 2016); see also *People v. Domagala*, 2013 IL 113688, ¶ 32. The Act provides for three stages of review by the trial court. At the first stage, the trial

court may summarily dismiss a petition that is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2016); *Domagala*, 2013 IL 113688, ¶ 32.

¶ 41      If the trial court does not dismiss a petition at the first stage, the petition advances to the second stage, where counsel is appointed if a defendant is indigent. After counsel determines whether to amend the petition, the State may file either a motion to dismiss or an answer to the petition. 725 ILCS 5/122-4, 122-5 (West 2016); *Domagala*, 2013 IL 113688, ¶ 33. At the second stage, the trial court must determine whether the petition and any accompanying documents make a "substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

¶ 42      If the defendant makes this showing at the second stage, then the petition advances to a third-stage evidentiary hearing. At a third-stage evidentiary hearing, the trial court acts as factfinder, determining witness credibility and the weight to be given particular testimony and evidence and resolving any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 43                                    II. Standard of Review

¶ 44      In this appeal, the trial court dismissed defendant's postconviction claims at issue during the second stage. During a second-stage dismissal hearing, the defendant bears the burden of making a substantial showing of a constitutional violation. *Domagala*, 2013 IL 113688, ¶ 35.

¶ 45      At this stage, the trial court accepts as true all well-pled facts that are not positively rebutted by the record. *Domagala*, 2013 IL 113688, ¶ 35 (citing *People v. Coleman*, 183 Ill. 2d 366, 385 (1998)). There is no fact finding or credibility determination at this stage. *Domagala*, 2013 IL 113688, ¶ 35 (citing *Coleman*, 183 Ill. 2d at 385). As a result, the State's motion to dismiss raises solely the issue of whether the petition is sufficient as a matter of

law. *Domagala*, 2013 IL 113688, ¶ 35 (citing *Coleman*, 183 Ill. 2d at 385). The question before the court is whether the petition's well-pled allegations, "*if proven* at an evidentiary hearing," would entitle the defendant to relief. (Emphasis in original.) *Domagala*, 2013 IL 113688, ¶ 35. Since this is a purely legal question, our review at the second stage is *de novo*. *Coleman*, 183 Ill. 2d at 387-89. *De novo* consideration in the case at bar means that we perform the same analysis that the trial judge would have performed, if we had been sitting during the second-stage dismissal hearing. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25 (citing *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)).

¶ 46                          III. *Strickland* and Ineffectiveness of Counsel

¶ 47            Defendant's first claim is that his counsel was ineffective.

¶ 48            Every Illinois defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Illinois Constitution. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Domagala*, 2013 IL 113688, ¶ 36. Claims of ineffective assistance are judged against the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Domagala*, 2013 IL 113688, ¶ 36 (citing *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting *Strickland* for Illinois)). To prevail on a claim of ineffective assistance, a defendant must show both (1) that counsel's performance was deficient and (2) that this deficient performance prejudiced defendant. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687).

¶ 49            To establish the first prong, that counsel's performance was deficient, a defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36. Counsel's performance "must be evaluated based on the entire record." *People v. Kirklin*, 2015 IL App (1st) 131420, ¶ 114.

¶ 50     To establish the second prong, that this deficient performance prejudiced the defendant, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694). "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004); *People v. Colon*, 225 Ill. 2d 125, 135 (2007). Thus, to satisfy the second prong of *Strickland*, at a second-stage postconviction proceeding, a defendant must make only a substantial showing of a reasonable probability. See *Domagala*, 2013 IL 113688, ¶ 35.

¶ 51     Although the *Strickland* test is a two-prong test, our analysis may proceed in any order. Since a defendant must satisfy both prongs of the *Strickland* test in order to prevail, a trial court may dismiss the claim if either prong is missing. *People v. Peterson*, 2017 IL 120331, ¶ 79; *People v. Cherry*, 2016 IL 118728, ¶ 24; *People v. Flores*, 153 Ill. 2d 264, 283 (1992). Thus, if a court finds that defendant was not prejudiced by the alleged error, it may dismiss on that basis alone without further analysis. *People v. Graham*, 206 Ill. 2d 465, 476 (2003); *Albanese*, 104 Ill. 2d at 527.

¶ 52                          IV. Trial Strategy and *Strickland*

¶ 53     In the case at bar, defendant claims that his trial counsel's performance was "objectively unreasonable under prevailing professional norms" for both failing to investigate and failing to call a particular alibi witness at trial. See *Domagala*, 2013 IL 113688, ¶ 36.

¶ 54     "A defense counsel has a professional duty to conduct a reasonable investigation or make a reasonable decision that a particular investigation is not necessary." *People v.*

15

*Robinson*, 2017 IL App (1st) 161595, ¶ 99; *Domagala*, 2013 IL 113688, ¶ 38. However, any lack of investigation is judged against a standard of reasonableness, given "all the circumstances" and "applying a heavy measure of deference to counsel's judgments." (Internal quotation marks omitted.) *People v. Guest*, 166 Ill. 2d 381, 400 (1995).

¶ 55　　　　In addition, "the decision whether to call a certain witness for the defense is a matter of trial strategy, left to the discretion of counsel after consultation with the defendant." *Peterson*, 2017 IL 120331, ¶ 80. As a result, "such decisions will not ordinarily support a claim of ineffective assistance of counsel." *Peterson*, 2017 IL 120331, ¶ 80. Even "a mistake in trial strategy" will not, by itself, render representation constitutionally defective. *Peterson*, 2017 IL 120331, ¶ 80.

¶ 56　　　　In the case at bar, defendant concedes that his proposed alibi witness, Avila, would have placed him at a gang meeting at the time of the shooting. At the second-stage dismissal hearing, the trial court specifically inquired about this point, and the defense conceded it:

> "THE COURT: [Counsel], you agree or do you agree that had [Avila] been contacted, she would have said that [defendant] was at the junta, that he was at a gang meeting[?]
>
> DEFENSE COUNSEL: Yes, Judge."

¶ 57　　　　The State's evidence at trial established that this was a gang-related, drive-by shooting. Prior to the testimony of Francisco Ortiz, defendant's trial counsel successfully prevented the State from introducing any testimony about defendant's gang affiliation. Pursuant to the trial court's ruling, Ortiz did not identify defendant as a member of any gang. While Ortiz testified that defendant had told him that members of the Latin Dragons had dented the passenger side of his vehicle, a dent—by itself, without any further evidence of

gang animus or affiliation—is not a particularly strong motive for premeditated murder. By blocking Ortiz from testifying about defendant's gang membership, trial counsel undermined the State's only evidence of motive and distanced defendant from a gang-related shooting.

¶ 58    Defendant's *pro se* petition, sworn to under penalties of perjury and later verified, admitted that defendant had discussed with his trial counsel whether to call Avila as an alibi witness. According to defendant, counsel had explained his reasons for not calling her as follows: " I didn't think it was a good idea to present some young, Latina, female who would put you at a junta with some Latin Kings as an alibi defense. It would definitely get you convicted." Defendant admits that he agreed, deciding to defer to counsel's judgment. Defendant stated that "he thought trial counsel knew best."

¶ 59    Thus, the record shows (1) that defendant and counsel discussed the proposed witness; (2) that they already knew what this witness could offer the defense; (3) that defendant agreed with his counsel's decision not to call her; and (4) that there was a reasonable strategic reason to not call her, namely, to keep evidence of defendant's gang affiliation from the jury when he stood accused of a gang-related shooting. See *Peterson*, 2017 IL 120331, ¶ 80 ("a mistake in trial strategy *** will not alone render representation constitutionally defective"). For these reasons, we cannot find that trial counsel's performance was "objectively unreasonable under prevailing professional norms" for not further investigating and not calling this proposed alibi witness. See *Domagala*, 2013 IL 113688, ¶ 36. As a result, we are not persuaded by defendant's claim of ineffective assistance of counsel. *Peterson*, 2017 IL 120331, ¶ 79 ("A failure by the defendant to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel.").

¶ 60                                    V. Sentencing

¶ 61        Defendant's second claim is that his case should be remanded for resentencing because a *de facto* life sentence imposed against a juvenile offender, as the result of mandatory sentencing laws, violates the eighth amendment and the proportionate penalties clause.

¶ 62        In *Miller v. Alabama*, 567 U.S. 460, 479 (2012), the United States Supreme Court found that the eighth amendment to the United States Constitution "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." Following *Miller*, our supreme court has "emphasized that a mandatory sentencing scheme for juveniles prevents the trial court from considering numerous mitigating factors." *People v. Reyes*, 2016 IL 119271, ¶ 3 (*per curiam*). As a result, our supreme court requires that a sentencing judge " 'must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles.' " *Reyes*, 2016 IL 119271, ¶ 3 (quoting *Miller*, 567 U.S. at 489). A *de facto* life-without-parole sentence must "be based on judicial discretion rather than statutory mandates." *Reyes*, 2016 IL 119271, ¶ 4.

¶ 63        In *Reyes*, as in the case at bar, the defendant "had not received an actual life sentence without possibility of parole." *Reyes*, 2016 IL 119271, ¶ 5. Instead, "the various sentencing statutes to which he was subject had combined in such a way so as to eliminate all judicial discretion and impose on him a mandatory prison term." *Reyes*, 2016 IL 119271, ¶ 5. As a result, our supreme court found that the sentence in *Reyes* constituted cruel and unusual punishment, vacated it, and remanded for resentencing, under the new sentencing law for juveniles. *Reyes*, 2016 IL 119271, ¶¶ 9, 11.

¶ 64    Our legislature has enacted a new sentencing law for juveniles, since defendant was sentenced in 2006, that requires a sentencing court to take into account certain mitigating factors and, most importantly for this case, frees the sentencing court from having to impose otherwise mandatory firearm enhancements. *Reyes*, 2016 IL 119271, ¶ 11; 730 ILCS 5/5-4.5-105 (West 2016). Those enhancements are now a matter of discretion for the sentencing court. *Reyes*, 2016 IL 119271, ¶ 11; 730 ILCS 5/5-4.5-105(b), (c) (West 2016).

¶ 65    In the instant case, defendant was 15 years old on April 1, 2000, the date of the offense. On June 9, 2005, defendant was sentenced in an unrelated case to 20 years for attempted first degree murder prior to the disposition of the first degree murder charge. On December 28, 2006, he was sentenced on the first degree murder charge to 45 years with IDOC. The 45-year sentence[3] was the mandatory minimum sentence he could have received, and it included a 25-year mandatory enhancement for personally discharging a firearm. See 730 ILCS 5/5-8-1(a)(1)(a) (West 2006) ("for first degree murder" the minimum adult sentence "shall not be less than 20 years"); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2006) ("if, during the commission of the offense, the person personally discharged a firearm that proximately caused *** death ***, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed"). In other words, at that time, the trial court had no other alternative but to sentence defendant to 45 years to run concurrent with the 20-year sentence.

¶ 66    Then, in 2012, in *Miller*, 567 U.S. at 479, the United States Supreme Court found that the eighth amendment "forbids a sentencing scheme that mandates life in prison without

---

[3]Even if we were to consider the 45-year sentence alone, we observe that the Illinois Supreme Court cited with approval the Wyoming case of *Bear Cloud v. State*, 2014 WY 113, ¶¶ 11, 33, 334 P.3d 132 (Wyo. 2014), in which the Wyoming Supreme Court found that a 45-year sentence, with a release date at 61 years old, constituted a "lifetime" sentence. See *Reyes*, 2016 IL 119271, ¶ 9. Similarly, this court has previously held that a 50-year sentence imposed on a 16-year-old was a *de facto* life sentence. *People v. Buffer*, 2017 IL App (1st) 142931, ¶ 62, *petition for leave to appeal allowed*, No. 122327 (Nov. 22, 2017). However, we do not base our holding on these cases.

possibility of parole for juvenile offenders." Then, in 2016, in *Reyes*, 2016 IL 119271, ¶ 4, our supreme court found that a *de facto* life sentence for a juvenile must "be based on judicial discretion rather than statutory mandates." As a result of these landmark decisions, the sentence in this case became a *de facto* life imprisonment because defendant will be 80 years old when he is released because he must serve 100% of the 45-year sentence (see 730 ILCS 5/3-6-3(a)(2)(i) (West 2016) (a prisoner serving a term for first degree murder "shall receive no sentence credit and shall serve the entire sentence imposed")) and 85% of the 20-year sentence (see 730 ILCS 5/3-6-3(a)(2)(ii) (West 2016) (a prisoner serving a sentence for attempted murder "shall receive no more than 4.5 days of sentence credit for each month" served or no more than 54 days per year, which is 15%)).[4] In making this determination, we are including the 20-year sentence in our analysis even though we can find no other case that used two unrelated sentences in computing what the courts consider a *de facto* life sentence. We do this to keep with the intentions of the United States and Illinois Supreme Court decisions where the motivation is to somehow save the lives of our youth who commit violent crimes before reaching maturity with the hope that after they reach maturity they will mend the errors in their ways and become useful citizens in the future.

¶ 67     At the 2006 sentencing in this case, the trial court observed that defendant's 45-year mandatory sentence in the case at bar had to run consecutively to his prior 20-year sentence. 730 ILCS 5/5-8-4(a)(i) (West 2006). The result was *de facto* life imprisonment, with a release date when defendant will be over 75 years old. See 730 ILCS 5/3-6-3(a)(2)(i) (West 2006) (an adult "prisoner who is serving a term of imprisonment for first degree murder *** 

---

[4]The 20-year sentence served at 85% is 17 years. Seventeen years, plus forty-five years for the murder sentence is sixty-two years. However, at sentencing, defendant received a credit for time served of just over four years. Sixty-two years minus four years meant that he had fifty-eight years more to serve at the time of sentencing. At the time of sentencing, defendant was 22 years old. Fifty-eight years more to serve for a twenty-two-year old means that he will not be released before age eighty.

shall receive no good conduct credit and shall serve the entire sentence imposed by the court"); *People v. Coty*, 2018 IL App (1st) 162383, ¶ 79 (given that the juvenile defendant will not be released until he is at least 84 years old, "this sentence is equivalent to condemning the defendant to natural life imprisonment"); *People v. Nieto*, 2016 IL App (1st) 121604, ¶ 42 ("Given that [the juvenile] defendant will not be released from prison until he is 94 years old, we find that he effectively received a sentence of natural life without parole."); *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 66 ("in determining whether a particular term of years is a natural life sentence in disguise, we must consider whether the defendant may be released from prison in his lifetime").

¶ 68       In general, appellate courts have found that a juvenile defendant is not subject to *de facto* life imprisonment, if he may be released sometime in his mid-60's. See, *e.g.*, *People v. Evans*, 2017 IL App (1st) 143562, ¶¶ 1, 14 (a juvenile defendant was not subject to *de facto* life imprisonment where release was possible at age 62); *People v. Hoy*, 2017 IL App (1st) 142596, ¶ 46 (juvenile sentence was constitutional, where release was possible at age 68); *People v. Jackson*, 2016 IL App (1st) 143025, ¶¶ 1-2, 8, 10 n.6 (affirming the denial for leave to file a successive postconviction petition, where the juvenile defendant's possible release was at age 66, and this court had already reduced his sentence on appeal); *People v. Applewhite*, 2016 IL App (1st) 142330, ¶ 16 (finding that a juvenile defendant's fully negotiated plea agreement and sentence were constitutional, where "he will be eligible for release at the age of 62"). *C.f. State v. Null*, 836 N.W.2d 41, 45 (Iowa 2013) (finding that a defendant was subject to *de facto* life imprisonment and vacating his sentence, where he

would not be released before age 69 and 4 months).[5] But see *People v. Sanders*, 2016 IL App (1st) 121732-B, ¶ 26 (a life expectancy of 64 years old "probably overstates the average life expectancy for minors committed to prison for lengthy terms"). With a release age of over 75 years old, defendant is far removed from any of these cases.

¶ 69            Defendant's *de facto* life sentence was the result of mandatory sentencing laws. At the moment of sentencing in this case, the trial court had no discretion but to enter a sentence that resulted in *de facto* life imprisonment of defendant. The State argues that the trial court could have entered a higher sentence. Since defendant was never going to see the light of day, entering a higher sentence would be pointless and does not demonstrate the exercise of any real discretion.

¶ 70            Although defendant's offenses were not part of a single course of conduct, as they were in *Reyes*, the effect was still the same in that mandatory laws robbed the sentencing court of any actual discretion. See *Reyes*, 2016 IL 119271, ¶ 10; see also *Nieto*, 2016 IL App (1st) 121604, ¶ 42. At the moment of sentencing, the court had no choice but to impose *de facto* life-without-parole incarceration.

¶ 71            In the *per curiam Reyes* opinion, the State "concede[d]" that the United States Supreme Court case of *Miller* barred a mandatory sentence for a juvenile that amounted to life imprisonment "for offenses committed in a single course of conduct." *Reyes*, 2016 IL 119271, ¶ 8. The court stated, "We agree." *Reyes*, 2016 IL 119271, ¶ 8. Although our supreme court agreed with the State's concession, as far as it went, the court never stated that

---

[5]However, there are outliers on either side. Compare *Gipson*, 2015 IL App (1st) 122451, ¶¶ 66, 69 (finding that a juvenile defendant's sentence shocks the conscience when, upon his potential release date, he "will be 60 years old"), and *Buffer*, 2017 IL app (1st) 142931, ¶ 62 (vacating a juvenile's sentence where after serving his entire sentence, "he will be 66 years old"), with *People v. Perez*, 2018 IL App (1st) 153629, ¶ 38 (affirming a juvenile's sentence where, "[a]fter serving his entire sentence, the 70-year-old defendant will be released"). However, even the outliers do not undermine our finding in this case.

its holding was limited to offenses committed in a single course of conduct. See *Reyes*, 2016 IL 119271, ¶ 8. The court's agreement was merely an acknowledgement that "[i]n *this* case, defendant committed offenses in a single course of conduct." (Emphasis added.) *Reyes*, 2016 IL 119271, ¶ 10. The *Reyes* court unequivocally stated its own holding—as opposed to the State's concession—as,"we hold that sentencing a juvenile offender to a mandatory term of years that is the functional equivalent of life without the possibility of parole constitutes cruel and unusual punishment in violation of the eighth amendment." *Reyes*, 2016 IL 119271, ¶ 9. This holding comports with the *Miller* holding that *Miller* is "implicate[d] [by] *any* life-without-parole sentence imposed on a juvenile." (Emphasis added.) *Miller*, 567 U.S. at 473. Discussing its prior rulings, the *Miller* Court stated, "we insisted in these rulings that a sentencer have the ability to consider the 'mitigating qualities of youth.' " *Miller*, 567 U.S. at 476 (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)). The *Miller* Court then held: "We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. That is what the sentencing court in this case was faced with—a sentencing scheme that mandated life in prison without possibility of parole for a juvenile offender. A sentencing court must be free to consider the age and maturity of the offender when he committed the crime, the total amount of time he will serve, and his age at release. Thus, we find unpersuasive the State's argument that, in order for this court to find that *Miller* applies, the offenses must have been committed in a single course of conduct. *Cf. Bear Cloud*, 2014 WY 113, ¶ 37 (the *Miller* process "must be applied to the entire sentencing package"). We acknowledge that this is an issue that the United States Supreme Court has yet to resolve. *Bear Cloud*, 2014 WY 113,

¶ 29; see also *Coty*, 2018 IL App (1st) 162383, ¶ 80 ("our supreme court has not yet defined what constitutes a *de facto* life sentence").

¶ 72    However, precedent from the Illinois Supreme Court does establish that a juvenile offender's age at sentencing is not a factor in a *Miller* analysis. For example, it was in *Reyes*, 2016 IL 119271, ¶ 9, that the Illinois Supreme Court found, based on its analysis of *Miller* and other cases, that "sentencing a juvenile offender for a mandatory term of years that is the functional equivalent of life without the possibility of parole constitutes cruel and unusual punishment." Our supreme court vacated the defendant's sentence and remanded so that a new sentencing hearing could be held. *Reyes*, 2016 IL 119271, ¶¶ 10, 14.

¶ 73    The defendant in *Reyes* was 16 years old on December 20, 2009, when the offenses were committed. *Reyes*, 2016 IL 119271, ¶ 1. However, he was not sentenced until March 29, 2012, almost two-and-a-half years later. *People v. Reyes*, 2015 IL App (2d) 120471, ¶ 6, *rev'd per curiam,* 2016 IL 119271. Even if we assume that the *Reyes* defendant had just turned 16 when the offenses were committed and, thus, was the youngest possible 16-year-old, he had to be over 18 years old when he was sentenced two-and-a-half years later. However, his age of sentencing was of so little importance to our supreme court that it was not mentioned once in its opinion. See *Reyes*, 2016 IL 119271; see also *Roper v. Simmons*, 543 U.S. 551, 555-56, 578 (2005) (finding that it was unconstitutional to execute a juvenile offender who was "younger than 18 when he committed a capital crime" although he had turned 18 before he was tried and sentenced nine months later).

¶ 74    Thus, the fact that a juvenile offender has become an adult prior to his sentencing does not bar the application of *Miller* and *Roper* and their progeny.

¶ 75      In addition, this court has previously written on the need "to expand juvenile sentencing provisions" to "young adult offenders." *People v. House*, 2015 IL App (1st) 110580, ¶ 96. In the case at bar, defendant was only 19 years old when he committed the offense that led to the 20-year sentence. In *House*, after analyzing *Miller* and *Roper*, we vacated a life sentence imposed on an offender who was also 19 years old at the time of the offense. *House*, 2015 IL App (1st) 110580, ¶ 102. This court wrote, "we find the designation that after age 18 an individual is a mature adult appears to be somewhat arbitrary." *House*, 2015 IL App (1st) 110580, ¶ 95. We then observed the lack of maturity in the developing young adult brain, and cited relevant supporting articles. *House*, 2015 IL App (1st) 110580, ¶¶ 95-96. Our statements in *House* further support our finding that the 20-year sentence is relevant to our consideration of *Miller*, *Roper*, and their progeny.

¶ 76      In *Jackson*, 2016 IL App (1st) 143025, this court had already reduced a juvenile defendant's sentence from 60 years to 50 years on direct appeal. *Jackson*, 2016 IL App (1st) 143025, ¶ 54. Thus, this court had already exercised discretion and carefully reviewed the defendant's record and determined that 50 years was an appropriate sentence. After this reduction, the *Jackson* defendant filed a postconviction petition claiming that the 50-year sentence was a *de facto* life sentence and that any life sentence, even a discretionary one, was inappropriate for a juvenile offender. In *Jackson*, we observed that our supreme court had already found in *People v. Davis*, 2014 IL 115595, ¶ 43, "that *Miller* permits a juvenile sentence of natural life without parole so long as the sentence is discretionary." *Jackson*, 2016 IL App (1st) 143025, ¶ 58. As a result, we had no choice but to reject his claim.

¶ 77           In the case before us, the sentence that the juvenile offender received was mandatory and, therefore, very different from the sentence in *Jackson* which was the product of an exercise of discretion by this court.

¶ 78           We wrote in *Jackson* that if we were "going to hold that" every "*de facto* life sentence," whether mandatory or discretionary, "qualifies for consideration under *Miller*, then we would need a consistent and uniform policy on what constitutes a *de facto* life sentence." *Jackson*, 2016 IL App (1st) 143025, ¶ 57. We hoped that "a different forum," *i.e.*, our supreme court, would hopefully provide that guidance shortly. *Jackson*, 2016 IL App (1st) 143025, ¶ 57. However, until that happens, the question is properly before us, and our supreme court may be waiting to hear what its appellate courts have to say first, in order to consider our collective wisdom before making its decision.

¶ 79           In conclusion, we vacate defendant's sentence and remand for resentencing under the sentencing scheme found in section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2016)), as our supreme court did in *Reyes*. *Reyes*, 2016 IL 119271, ¶ 12. As our supreme court observed, under "this new sentencing scheme, the circuit court will have the discretion *not* to apply the firearm sentencing enhancements." (Emphasis in original.) *Reyes*, 2016 IL 119271, ¶ 12. Thus, the trial court will have the discretion to impose, or to not impose, the enhancement. See *People v. Holman*, 2017 IL 120655, ¶ 40 ("Life sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment, unless the trial court considers youth and its attendant characteristics.").

¶ 80           While we recognize that the relief following a second-stage dismissal under the Act ordinarily involves a remand for a third-stage evidentiary hearing, the issue before us is a

purely legal question that does not require the typical resolution of credibility disputes and assessment of evidence that normally occurs at a third-stage evidentiary hearing. *Buffer*, 2017 IL App (1st) 142931, ¶ 66 (declining to remand to the trial court after a first-stage dismissal, after this court found that resentencing was required for a juvenile offender facing *de facto* life imprisonment); *Nieto*, 2016 IL App (1st) 121604, ¶ 57 (declining to remand after a first-stage dismissal, after this court vacated a juvenile offender's sentence). Remanding a purely legal question to the trial court would be a waste of judicial resources. *Buffer*, 2017 IL App (1st) 142931, ¶ 66 (declining to remand in light of "both judicial economy and the particular issue raised in this appeal"); *Nieto*, 2016 IL App (1st) 121604, ¶ 57 (declining to remand in light of "[t]he particular issue raised in this appeal").

¶ 81                                     CONCLUSION

¶ 82        In this appeal, defendant appealed the second-stage dismissal of the following two claims: (1) that he had made a substantial showing of ineffective assistance of trial counsel because counsel had failed to investigate an alibi witness and failed to call her to testify that defendant was at a gang meeting with her at the time of the shooting and (2) that his case should be remanded for resentencing because a *de facto* life sentence imposed against a juvenile offender, as the result of mandatory sentencing laws, violates the eighth amendment and the proportionate penalties clause.

¶ 83        For the foregoing reasons, we did not find his first claim persuasive, but we vacate his sentence and remand for resentencing under the new sentencing scheme found in section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2016)).

¶ 84        Affirmed in part and vacated in part; cause remanded with directions.

¶ 85        PRESIDING JUSTICE McBRIDE, specially concurring:

¶ 86        I agree with the decision to remand for a new sentencing hearing in this case for the reasons stated above. I write separately in further support, and to note that the precise sentencing issue on appeal has not previously been addressed.

¶ 87        In recent years, courts have been required to impose mandatory minimum sentences upon offenders convicted of certain serious offenses. *People v. Sharpe*, 216 Ill. 2d 481, 525 (2005). These mandatory minimums apply to both adult offenders, and juvenile offenders who are tried as adults. For example, a first degree murder conviction in which the defendant personally discharged a firearm that caused the death, results in a minimum sentence of 45 years; 20 years for the murder and 25 years for a mandatory firearm enhancement (see 730 ILCS 5/5–8–1(a)(1)(d)(iii) (West 2016)). Similarly, if a person commits an armed robbery he is sentenced as a Class X offender to a minimum of 6 years, and if he does so while armed with a firearm, the court is required to add a 15 year firearm enhancement to the sentence. 720 ILCS 5/18-2(b) (West 2016); see also *People v. Blair*, 2013 IL 114122, ¶ 4.  If he discharges that firearm during the commission of the offense, the enhancement goes up to 20 years, and if the firearm discharge proximately causes great bodily harm, permanent disability, permanent disfigurement or death, the enhancement increases to 25 years. *Id*. Additionally, a habitual offender who has attained the age of 18 at the time of a third Class X felony conviction is required to be sentenced to life in prison (730 ILCS 5/5-4.5-95(a)(5)(West 2016)), and an offender under 21 years old who is convicted of a third Class 1 or 2 felony  is generally required to be sentenced as a Class X offender (730 ILCS 5/5-4.5-95(b)(West 2016)). Moreover, although some offenses still allow for day for day credit, other Illinois statutes require offenders to serve 100% of the sentence imposed for first degree

28

murder convictions, or 85% of the sentence for attempted first degree murder, criminal sexual assault, aggravated battery and other delineated convictions. See *People v. Harris*, 2016 IL App (1st) 141744, ¶ 49; 730 ILCS 5/3-6-3(a)(2)(i), (ii) (eff. Jan. 8, 2018). The effect of the above provisions is that persons convicted of crimes—adults and juveniles tried as adults—are spending more time in prison than those convicted of the same types of crimes in previous years.

¶ 88       Recently, however, the Illinois legislature has enacted several statutes impacting the ways juvenile offenders are prosecuted and sentenced for criminal offenses. Specifically, the legislature has extended jurisdiction of the Juvenile Court Act from under 17 years, to under 18 years of age at time of an offender's alleged offense, (Public Act 98–61, section 5 (eff. Jan. 1, 2014) (amending 705 ILCS 405/5–120 (2012)), changed the automatic transfer age for certain offenses from 15 to 16 years of age, and has removed armed robbery with a firearm and vehicular hijacking with a firearm from the list of offenses that are subject to an automatic transfer (Pub. Act 99-258 (eff. Jan. 1, 2016) (amending 705 ILCS 405/5-130(1)(a) (West 2014)). The legislature has also amended the Unified Code of Corrections, to add provisions requiring the trial court to consider additional mitigating factors (730 ILCS 5/5-4.5-105(a) (West 2016)), and allowing the trial court, in its discretion, to decline to impose firearms enhancements (730 ILCS 5/5-4.5-105(b) (West 2016)), when sentencing individuals under the age of 18 in criminal court.

¶ 89       Additionally, some states, including Illinois, are reconsidering their prior decisions to abolish the parole system (see *People v. Artis*, 232 Ill. 2d 156, 162-65 (2009) (noting that parole was abolished in Illinois for felons sentenced after February 1, 1978)) particularly for offenders who have committed their offenses as juveniles or as young adults. See also Ariz.

Rev. Stat. Ann. § 13-716 (2016) (allowing a person sentenced to life imprisonment with the possibility of release for an offense committed before 18 years of age to be eligible for parole upon completion of the minimum sentence, and applying retroactively, regardless of when the offense was committed); Cal. Penal Code § 3051 (West 2016) (describing different timelines for parole eligibility for "youth offender[s]" based on the sentence imposed and whether they were under the age of 18, or 25, at the time of their offenses); La. Stat. Ann. § 15:574.4 (2016) (describing different timelines for parole eligibility for juvenile offenders based on their convictions and sentences). Specifically, in Illinois, there is proposed legislation which would amend the Unified Code of Corrections so that, generally, a person under the age of 21 years at the time of the commission of an offense other than first degree murder, would be eligible for parole review after serving 10 years, and a person under the age of 21 years at the time of the commission of the offense of first degree murder would be eligible for parole review after serving 20 years. 100th Ill. Gen. Assem., Senate Bill 3228, 2018 Sess. *Id.* The proposed legislation, however, provides for such review only for persons sentenced on or after the effective date of the amendatory Act.

¶ 90    The changes, and proposed changes, in our statutes, reflect a shift in the way that we view juvenile offenders, and a recognition that juvenile offenders are children, and that they should be treated differently from adult offenders in the administration of our system of justice.

¶ 91    In *Miller v. Alabama*, 567 U.S. 460, 479 (2012), the U.S. Supreme Court held that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders. The decision is based upon the notion that mandatory life without parole for juvenile offenders amounts to cruel and unusual

punishment because the brains of youthful offenders are not fully developed and juvenile offenders are both less culpable and more likely to reform as they age. *Id.*, at 471-72, 489. As a consequence, sentencing courts must have the opportunity to consider youth and its attendant circumstances before imposing life in prison without parole upon a juvenile. *Id.*, at 465.

¶ 92    The cases where sentences of mandatory life without parole have been imposed upon a juvenile are easy to discern, and Illinois courts have responded and have remanded those cases for new sentencing hearings in accord with the *Miller* decision. Although *Miller* does not specifically speak to *de facto* life sentences, our courts have generally determined that the letter and spirit of *Miller* requires us to also allow relief to those who are serving lengthy mandatory minimum sentences that amount to *de facto* life sentences in prison without parole. Courts however have struggled with how to apply *Miller* in such cases, and how to determine what kind of sentence amounts to a *de facto* life sentence. As the majority decision points out, our appellate court is divided on what amounts to a *de facto* life sentence, and we await a decision from the Illinois Supreme Court, which has allowed a petition for leave to appeal in *People v. Buffer* which held a 50 year sentence imposed upon a juvenile convicted of murder was a *de facto* life sentence and entitled that juvenile to a new sentencing hearing under *Miller*. *People v. Buffer*, 2017 IL App (1st) 142931, ¶¶ 64, 69, *appeal allowed*, 93 N.E.3d 1076 (Ill. 2017).

¶ 93    In this case, there is no dispute that defendant's sentence of 45 years was the mandated minimum sentence which could be imposed for a murder he committed as a juvenile. Further, there is no dispute that when combined with the 20 year sentence defendant received for an offense he committed as an adult, his sentences for both crimes became a

total combined sentence of 65 years, and defendant will remain incarcerated until he is approximately 80 years old. A 65 year sentence, imposed on a juvenile convicted as an adult, strictly in terms of years amounts to what some courts have found to be a *de facto* life sentence without parole. See *infra* cases cited in majority. Although part of the sentence—20 years—was for a separate offense committed by the defendant when he was an adult, the two sentences together will likely guarantee that defendant will die in prison. See *Buffer*, 2017 IL App (1st) 142931, ¶ 59, appeal allowed, 93 N.E.3d 1076 (Ill. 2017) (noting that " 'a person held in a general prison population has a life expectancy of about 64 years' and that this estimate 'probably overstates the average life expectancy for minors committed to prison for lengthy terms.' ").

¶ 94    The United States Supreme Court in *Miller* also observed that due to children's diminished culpability and heightened capacity for change, sentencing juveniles to life in prison "will be uncommon." *Miller*, 567 U.S. at 479. This is especially so because of the great difficulty of distinguishing between the juvenile offender " 'whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " *Id.* at 479-80, quoting *Roper*, 543 U.S. at 573. The Court explained however that it was "not foreclos[ing] a sentencer's ability to make that judgment in homicide cases" but that before imposing such a sentence, the court was "require[d] *** to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.*

¶ 95    Although I agree with the dissent that no court has reached the decision we reach here, the number of years which defendant will have to serve because of Illinois' mandatory sentencing provisions amounts to a *de facto* life sentence without parole, in large part

because of a murder defendant committed as a juvenile. However, the two mandatory sentencing schemes applicable here did not allow the trial court the opportunity to take into account how juvenile offenders are different, and to consider defendant's youth and attendant circumstances when making its sentencing decision. Accordingly, it is my view that a remand is necessary for the sentencing court to determine if defendant is one of those rare juveniles whose crimes reflect "irreparable corruption," when deciding whether to enter a sentence which amounts to life in prison. I note, however, that our decision in no way forecloses the trial court from imposing a *de facto* life sentence if it decides that this defendant and his convictions warrant such a sentence.

¶ 96    In this case, the trial court must also make its sentencing decision in light of the 20 year prison term that was already imposed on defendant, for a conviction for attempted murder involving the use of a bat. A remand is even more important in this case because there is very little information about the facts or circumstances surrounding this other conviction in the record, making it difficult to review the entire circumstances presented by this appeal.

¶ 97    Unless we remand this and other similar cases for new sentencing hearings, we cannot be assured that these mandatory *de facto* life sentences were imposed upon those rare juvenile offenders "whose crime reflects irreparable corruption." The trial court should have the opportunity to make that determination.

¶ 98    Accordingly, I concur for these and the reasons stated in the majority decision entered above.

¶ 99        JUSTICE BURKE, dissenting:

¶ 100        The majority finds that defendant's sentence for the murder he committed when he was a juvenile, combined with the sentence he received for a crime committed as an adult triggers the protections of the new juvenile sentencing guidelines prohibiting a *de facto* sentence of natural life. A consecutive sentence under both the Juvenile Court Act and the adult criminal sentencing statutes, as in this case, does not create a *de facto* life sentence subject to reversal under the protections given to juveniles pursuant to 735 ILCS 5/5-4.5-105 (West 2016). There is no case that holds this, and there is no statute that supports the majority's holding. Therefore, I respectfully dissent.

¶ 101        The defendant in this case committed a murder at the age of 15 in 2000. He was released on bond in June 2001. When he did not show up in court again, a warrant issued. He was arrested in February 2004 for another offense and charged with attempted murder, aggravated kidnapping, and aggravated battery. In February 2004, defendant was 19 years old. The adult charge of attempted murder was tried first and he was sentenced to 20 years' imprisonment. Because the crime was committed with a baseball bat and not a firearm, no firearm enhancement was applied to his sentence. This sentence was within the sentencing parameters of 6 to 30 years. 730 ILCS 5/5-4.5-25 (West 2004). Following his conviction and sentence on the adult charge, defendant was tried on the juvenile 2000 murder charge in adult court and found guilty. Because this offense was committed with a firearm, the trial court applied the mandatory 25-year firearm enhancement which resulted in the minimum sentence of 45 years. When defendant committed the 2004 attempted murder, he was on bond, which required his 20 year sentence to run consecutively to the murder sentence of 45 years.

¶ 102    The 25-year firearm enhancement was not discretionary at the time of defendant's 2000 offense. When defendant was sentenced, a firearm enhancement was mandatory. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2002). The Illinois Supreme Court in *People v. Hunter*, 2017 IL 121306, held that the trial court has discretion to apply the enhancement but that discretion does not apply to cases retroactively. Therefore, the sentence of 45 years was the minimum the trial court could allow.

¶ 103    A sentence of 45 years for a juvenile has repeatedly been found to not be a *de facto* life sentence. In *People v. Jackson*, 2016 IL App 143025, ¶¶ 54-58, Justice Gordon, as the authoring Justice, found that the 16-year-old defendant's 50-year sentence was not a *de facto* life sentence. Similarly, in *People v. Applewhite*, 2016 IL App (1st) 142330, ¶ 16, this court found that the 17-year-old defendant's 45-year sentence was not a *de facto* life sentence. See also *People v. Evans*, 2017 IL App (1st) 143562, ¶¶ 15-18 (finding that the defendant's 90-year sentence was not a *de facto* life sentence, where defendant was 17 years old at the time of the offense and could receive day-for-day good conduct credit against his sentence, which could result in a sentence of only 45 years).

¶ 104    The only way for this court to find that defendant's sentence in this case results in a *de facto* life sentence is if we combine the 45-year sentence for the juvenile offense with defendant's 20-year sentence for the offense he committed as an adult. Defendant's adult sentence of 20 years is required to run consecutively to the 45-year sentence (730 ILCS 5/5-8-4 (West 2006)) for a total term of imprisonment of 65 years.

¶ 105    The unique question posed by this appeal is: does this combination of a sentence for an offense committed as a juvenile and a sentence for an offense committed as an adult warrant remand for the trial court to consider all of the mitigation required under the new

juvenile sentencing provisions, and to allow the trial court discretion in determining whether to assess to additional firearm enhancement. I maintain that it does not.

¶ 106    Defendant's 20-year sentence for attempted murder was based on an offense he committed when he was an adult and defendant was sentenced when he was an adult. This court and the supreme court have repeatedly refused to apply the new juvenile sentencing protections to young adults. See *People v. Thomas*, 2017 IL App (1st) 14255, ¶ 28 ("[T]his court has held that where an adult defendant receives a sentence that approaches the span of the defendant's lifetime, that term does not implicate the eight amendment right barring cruel and unusual punishment. Defendant cannot demonstrate otherwise under *Miller*, *Roper*, and *Graham*, which involve capital punishment or life sentences without parole for *juvenile* offenders." (Emphasis added.)). The majority contends that this court's decision in *People v. House*, 2015 IL App (1st) 110580, suggests that young adults should be afforded the same protections as juvenile offenders. This decision stands against the weight of the authority on this issue. See *People v. Pittman*, 2018 IL App (1st) 152030, ¶ 38 (declining to follow the reasoning in *House* where defendant was not a juvenile at the time of the offense); *People v. McKee*, 2017 IL App (3d) 140881, ¶ 29 (same); *People v. Thomas*, 2017 IL App (1st) 142557, ¶ 34 (same); *People v. Ybarra*, 2016 IL App (1st) 142406, ¶¶ 27-30 (same).

¶ 107    The majority also places a great deal of emphasis on the fact that defendant's sentence in this case was mandatory, and the court had no discretion in determining his sentence. This, however, was not the case. The court had discretion to sentence defendant within the sentencing range of 6 to 30 years for his conviction of attempted murder. 730

36

ILCS 5/5-4.5-25 (West 2004). There was no mandatory enhancement involved robbing the court of discretion and the ability to consider mitigating circumstances.

¶ 108      The majority also attempts to confuse the issue by asserting that the defendant in *Reyes* was not a juvenile at the time of sentencing, but the supreme court did not consider that a factor in vacating his sentence as unconstitutional. Instead, the supreme court focused solely on defendant's age at the time of the offense. This argument undercuts, rather than supports, the majority's conclusion. In the case at bar, defendant was 19 years old at the time of his attempted murder offense. The Supreme Court in *Reyes* did not indicate it would extend the protections of *Miller* to adult offenders. *Thomas* 2017 IL App 142557, ¶ 26. I agree with the majority that defendant's age at the time of sentencing is irrelevant. If the court had sentenced defendant to a term of imprisonment of 65 years solely for his juvenile offense, I would concur with the majority's holding. However, that is not what happened in this case, and the majority's attempt to conflate defendants' two sentences in order to find them unconstitutional is contrary to our well-established precedent.

¶ 109      Simply put, juvenile sentencing provisions do not apply once the defendant is 18. Although one of defendant's sentences was for an offense he committed while he was a juvenile, the other sentence was not. As discussed, the juvenile sentence, standing alone, does not represent a *de facto* life sentence in violation of the eighth amendment, and the second sentence for an offense that occurred when defendant was an adult, cannot be arbitrarily added to that sentence in determining whether it is unconstitutional. This is true regardless of the fact that the sentences are to run consecutively. This is not a situation as in *Reyes* where the sentence is a result of a "single course of conduct" (*Reyes*, 2016 IL 119271, ¶ 10) where the offenses occurred years apart, and, crucially, one of them occurred when defendant was

no longer a juvenile. The majority's decision to grant defendant juvenile protections for a crime committed as an adult where he was sentenced as an adult affords defendant protections that are not contemplated by the statute or by Illinois precedent.

¶ 110     For the reasons stated, it is my opinion that defendant cannot avail himself of the sentencing protection of the new juvenile sentencing provisions because he was not a juvenile when he committed the attempted murder offense, and I would affirm the trial court's judgment.