2023 IL App (1st) 211026-U

SECOND DIVISION
February 14, 2023

No. 1-21-1026

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 05 CR 1897801 |
| JULIO GUERRERO, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Lawrence Flood, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Ellis and Cobbs concurred in the judgment.

**O R D E R**

¶ 1    *Held*:   The circuit court erred in dismissing the petitioner's postconviction petition at the second stage of postconviction proceedings. While the petition failed to make a substantial showing of defense counsel's *per se* conflict of interest, it made a substantial showing of both an actual conflict of interest and of counsel's constitutionally ineffective representation premised on his failure to investigate and implicate alternative suspects in the crime.

¶ 2    After a jury trial in the circuit court of cook County, the petitioner, Julio Guerrero, was

found guilty of first-degree murder (720 ILCS 5/8-4, 9-1 (West 2006)) and sentenced to 48 year's imprisonment. The petitioner now appeals form the second-stage dismissal of his petition for relief under the Post-Conviction Hearing Act 725 ILCS 5/122-1 *et seq*. (West 2010). He contends that his petition should have been permitted to proceed to an evidentiary hearing because he made a substantial showing that his trial counsel, Michael Monaco (Monaco), labored under a *per se* or actual conflict of interest when he represented Jorge Uriarte (Uriarte) in the instant matter, prior to the petitioner's trial, and Robert Cardena (Cardena), in a separate murder trial while contemporaneously representing the petitioner. In addition, the petitioner contends that trial counsel was ineffective for failing to investigate Uriarte and Cardena as alternative suspects and present evidence showing that they matched the eyewitnesses' description of the shooter, had a motive to kill the victim, and were members of a criminal enterprise that used influence to cover up its crimes. For the following reasons, we affirm in part and reverse and remand in part.

¶ 3                                    I. BACKGROUND

¶ 4      Because the underlying facts of this case have already been adequately set forth in the order involving the petitioner's direct appeal (see *People v. Guerrero*, 403 Ill. App. 3d 1102 (2010) (unpublished order pursuant to Illinois Supreme Court Rule 23)) we recite only those facts necessary to the disposition of the issues raised by the petitioner's postconviction petition.

¶ 5      On July 24, 2005, the petitioner was arrested together with Urirate and Cardena for his involvement in the shooting of the victim Honor Huerta in a vacant parking lot at 4826 South Loomis Boulevard. Uriarte and Cardena were subsequently released, and the petitioner was charged with, *inter alia*, first degree murder. Three eyewitnesses to the shooting, Mitchell Rosas (Mitchell), Mitchell's brother, Michael Rosas (Michael), and Erik Calderon (Erik), testified at the

petitioner's trial. None of them identified the petitioner as the shooter.[1] Instead the petitioner was convicted on the basis of purely circumstantial evidence.

¶ 6    At trial, all three witnesses testified that they were with the victim at about 2 a.m. on July 24, 2005. After purchasing beer at a local liquor store, Michael drove Mitchell, Erik, and the victim to a vacant lot at 4826 South Loomis Boulevard.

¶ 7    Both Mitchell and Michael testified that as they drove into the lot, they saw two men standing on Loomis Boulevard, one wearing a black shirt and the other one a white shirt. Both averred that as they were exiting their van the two men walked separate ways, with the man in the black shirt walking northbound on Loomis Boulevard, and the man in the white shirt walking southbound. Once they exited the car, the victim walked towards Loomis Boulevard. As Mitchell and Michael followed the victim, Mitchell saw the man in the white shirt come out from behind a bush and pull out a gun. Both Mitchell and Michael heard the man in the white shirt scream "City Knight, La Raza Killer" before they heard gunshots.

¶ 8    As soon as they heard the gunshots, Mitchell and Michael turned and fled the scene. As they were running, they both heard about eight or nine shots.

¶ 9    After returning to the scene to look for his brother, Mitchell found the victim lying motionless face down on the ground.

¶ 10    Michael testified that as soon as the gunshots stopped, he ran back to look for the victim. As he was running towards Loomis Boulevard, he saw a police car and heard a police officer instructing him to "stop." Michael, however, continued running back to the scene. When he reached Loomis Boulevard, he saw the man in the white shirt running towards the viaduct on 49th

---

[1] Prior to trial, Michell, Michael, and Erik all viewed lineups, which including the petitioner. While Mitchell and Michael identified the petitioner from the lineup, prior to trial, the circuit court suppressed their identifications as suggestive because the police had paraded the petitioner in handcuffs in front of both witnesses prior to the lineup. Erik did not identify anyone from the lineup.

Street. Michael pointed towards the man in the white shirt and told the police officer that this was the shooter.

¶ 11 At trial, both Mitchell and Michael testified that they could not identify the shooter. Mitchell stated that he did not see the shooter's face and instead, "just [saw] a white shirt. That's it." Michael similarly stated that he did not see the shooter's face but recalled that he was "baldheaded" and "a little chunky."

¶ 12 On cross-examination, Michael admitted that he did not know if the person in white "actually was the one who shot." He also conceded that he could not see peripherally north or south beyond the vacant lot when he parked his van, as the lot was flanked by a house on either side. He therefore did not know whether there were any other people north or south of the empty lot around the time of the shooting.

¶ 13 On cross-examination, Mitchell, similarly, acknowledged that prior to the shooting, he lost sight of the man in the white shirt and was therefore not certain if that man was the same one that he later observed jump out of the bush with the gun.

¶ 14 The third eyewitness, Erik next testified that as they were parking in the vacant lot, he observed only one person walking northbound on Loomis Boulevard. Erik averred that when the victim exited the van and began to walk down the street, he did not pay much attention to him because he was "grabbing the beer and closing the van." As he closed the door, Erik heard someone say, "City Knights" and then heard eight or nine gunshots that appeared to be coming from the sidewalk near 48th Street and Loomis Boulevard. As soon as he heard the gunshots, Erik fled towards the alley and into his friend's house.

¶ 15 Erik was similarly unable to identify the shooter because he never saw the shooter's face. On cross-examination he further admitted that he could not recall whether the shooter was wearing

dark or light clothing. In addition, Erik acknowledged that he viewed a lineup, which included the petitioner, but could not identify the petitioner as the shooter.

¶ 16    Chicago Police Officer Patrick Johnson next testified that at about 2 p.m. on July 24, 2005, he was on patrol near 49th Street and Loomis Boulevard when he heard gunshots. Seconds later, the officer saw and individual, whom he later identified as Michael, running across the alley. Officer Johnson instructed Michael to "stop" but Michael continued running toward the vacant lot and told the officer "They're shooting at us." Officer Johnson ran with Michael. When they reached the sidewalk on Loomis Boulevard, Michael pointed southbound towards three men, who were standing a half block away, just north of the viaduct on 49th Street, and told the officer "They are right there."

¶ 17    According to Officer Johnson all three men were "essentially the same height," with the same kind of "close-cropped" hairstyle and skin tone. Two of them had dark clothing, while one was wearing a white shirt. Officer Johnson shined his flashlight on the three men, and observed the man in the white shirt, whom he identified in court as the petitioner, shove an object into his waistband. As the officer shined the light on the men, they ran in different directions.

¶ 18    Officer Johnson chased the petitioner under the viaduct and into a vacant lot. The petitioner held onto the object in his waistband the entire time that he fled. When the officer caught the petitioner, he tackled him face-down on the ground. For about a minute, the officer struggled to handcuff the petitioner because the petitioner kept his hands under his body by his waist. After eventually restraining the petitioner, Officer Johnson retrieved a Lugar 9-milimeter semi-automatic pistol from the ground where the petitioner had been tackled. The gun's top slide was in a "lock position" indicating that every round had been fired.

¶ 19    On cross-examination, Officer Johnson admitted that when he first saw the petitioner, the

petitioner did not have a gun in his hand.

¶ 20    On cross-examination, Officer Johnson also acknowledged that the two men that he saw standing next to the petitioner under the viaduct, whom he later identified as Uriarte and Cardena, were arrested together with the petitioner. Officer Johnson stated, however, that unlike the petitioner, these two men were wearing "dark clothes."

¶ 21    On cross-examination Officer Johnson also acknowledged that the white shirt worn by the petitioner was a White Sox jersey, which contained the word "Chicago" in black and red letters across the front and had dark blue and red markings around the neck and sleeves.

¶ 22    On cross-examination, Officer Johnson denied that when they reached the vacant lot, the petitioner got on his knees and put his hands up, so that the officer could arrest him.

¶ 23    Additional evidence offered at the petitioner's trial established that two bullets were recovered from the victim's body during the autopsy and that the police recovered nine spent cartridge cases from a 9-milimeter semi-automatic pistol at the scene of the crime. No latent fingerprints were found on any of those cartridges, the bullets, or the firearm recovered from the petitioner. However, after comparison, it was determined that the two bullets and all nine spent cartridge cases were fired from the same firearm recovered from the petitioner upon his arrest.

¶ 24    In addition, evidence at trial established that when they were brought to the police station, the petitioner, Cardena, and Uriarte were all tested for gunshot residue. Forensic scientist Ellen Connolly testified that she analyzed the gunshot residue kits administered to all three men and could not conclusively determine that any of them had recently fired a gun. Connolly explained that while she found one particle of gunshot residue on the petitioner's hand and two particles on his clothing (one on his jersey and one on his blue jeans) there were not enough particles to conclude that he had fired a gun. She therefore opined that he "may not have discharged a

6

firearm," or that if he did, the particles were not detected, were not deposited, or were removed by activity. With respect to Cardena and Uriarte, Connolly noted no gunshot residue on their samples and similarly opined that they "may not have discharged a firearm" or, if they did, the particles were removed by activity, not detected, or not deposited.

¶ 25    During the petitioner's trial, the State also introduced into evidence a video recording of the petitioner inside a police interview room where he was placed upon his arrest. That video recording shows the petitioner alone in the room, wiping his hands inside his pants, and against the wall until the watch sergeant comes into the room to reposition his handcuffs.[2]

¶ 26    At trial, the State also offered evidence by Chicago Police Detective Michael Rose. He testified that La Raza is a street gang whose claimed territory includes the 4800 block of South Loomis Boulevard, and that its rival gang the City Knights lay claim to territory located four blocks away from the scene of the crime. Detective Rose described City Knights gang insignia to include a grim reaper and a knight chess piece and testified that at the time of his arrest, the petitioner had three such tattoos on his back– two large grim reapers and a large cross inlaid with a knight chess piece.

¶ 27    On cross-examination, Detective Rose confirmed that a photograph depicting a tattoo of a knight chess piece on Uriarte's back was also a City Knights gang tattoo.

¶ 28    In addition, on cross-examination, Detective Rose acknowledged that he interviewed Erik immediately after the shooting, and that contrary to Erik's testimony at trial, at that time, Erik told him that he had observed two men walking in separate directions on Loomis Boulevard, one going north and the other going south, and that the shooter was "possibly" wearing a "dark

---

[2] While the video recording is not part of the instant record on appeal, in its decision affirming the petitioner's conviction, this appellate court described the substance of the video recording in such a manner.

colored top."

¶ 29    In his case-in-chief, the petitioner presented two witnesses. Chicago Police Officer Schemelar first testified that he was present for and assisted in the petitioner's arrest. Contrary to Officer Johnson's trial testimony, Officer Schemelar averred that after Officer Johnson and another officer chased the petitioner into an empty lot and ordered the petitioner to stop, the petitioner obliged, slowed down, and raised both hands above his head, before he went to the ground and was taken into custody. Officer Schemelar was not sure whether the petitioner was "taken down" by Officer Johnson or whether he fell to the ground.

¶ 30    Licensed gunsmith and gun dealer Vern Trester next testified that while not trained in chemistry or forensic science, he has testified as a firearms expert in several other trials. Trester then explained how the firearm recovered from the petitioner operates and how it discharges gunshot residue. He stated that after test-firing a firearm of the same model nine times, he saw a "tremendous amount" of discharged gunpowder on his gloved hand.

¶ 31    On cross-examination, Trester acknowledged that he did not put the gun in his waistband and run over a block, nor roll about on the ground prior to testing for gunshot residue. Tester also admitted that "every gun, even the same model, is a little bit different."

¶ 32    In rebuttal, the State recalled forensic scientist Connolly who testified that Tester's glove test was not a scientifically accepted method of testing gunshot residue because the gunpowder he saw on the glove is not the same as the microscopic gunshot residue that she utilized in her analysis.

¶ 33    The parties next proceeded with closing arguments. The State acknowledged that Mitchell and Michael did not get a good look at the shooter's face but argued that they knew "the person in white" was the individual who "pulled the trigger." The State pointed out that the

petitioner was caught less than a minute after the shooting wearing a white shirt and in possession of the murder weapon. In addition, the State emphasized that the shooter called himself a "City Knight" and that the petitioner had City Knight tattoos on his back. As further evidence of the petitioner's guilty, the State pointed to the petitioner's flight form the police, his "struggle" to conceal the murder weapon and his attempt to wipe the gunshot residue off his hands while in police custody.

¶ 34    Defense counsel, Monaco, on the other hand, argued that no witnesses had identified the petitioner as the shooter, and that no one accurately described the White Sox jersey that the petitioner was wearing upon his arrest. In addition, counsel argued that Erik was impeached by his prior statement to Detective Rose that the shooter was "possibly wearing a dark" shirt.

¶ 35    Defense counsel argued that it was possible for "a person to receive a gun from another person," and stated that there could have been two people with white shirts at the scene of the crime because none of the eyewitnesses could see on either side of the vacant lot, and therefore did not know if there were any other people in the area.

¶ 36    To explain the petitioner's possession of the murder weapon, defense counsel suggested that that the petitioner got the firearm from someone else and "was told to bolt." In support, defense counsel highlighted the lack of gunshot residue found on the petitioner, noting that the petitioner was tested very "thoroughly" but found to have only "two little specs" of gunshot residue on his entire body (clothes and hands). While defense counsel acknowledged the interview room video, he argued that the petitioner was not "clever enough" to wipe microscopic gunshot residue off his hands and that the video in fact depicted him "putting his hands in his pants *** like he need[ed] to urinate."

¶ 37    In rebuttal, the State argued that Erik's identification of the dark shirt could have been the

9

dark parts of the petitioner's White Sox jersey. In addition, they pointed out that the two other individuals arrested with the petitioner could not have been the shooters because they were dressed in black and tested negative for gunshot residue.

¶ 38    Following jury instructions and deliberations, the jury found the petitioner guilty of first-degree murder.

¶ 39    Defense counsel subsequently filed a motion for a new trial. After that motion was denied, the petitioner informed the court that he was in the process of hiring a new attorney because his defense counsel, Monaco, had provided him with "ineffective assistance of counsel," by, *inter alia*, failing to offer any testimony at his trial from the two individuals who were also arrested at the scene of the crime. The trial court denied the petitioner's motion and subsequently sentenced him to 48 years' imprisonment.

¶ 40    The petitioner appealed his conviction challenging, *inter alia*, the sufficiency of the evidence used to convict him. This court affirmed the petitioner's conviction finding that the circumstantial evidence offered at his trial was sufficient for the jury to find him guilty beyond a reasonable doubt. *People v. Guerrero*, 403 Ill. App. 3d 1102 (2010) (unpublished order pursuant to Illinois Supreme Court Rule 23), *pet. for leave to appeal denied*, 239 Ill. 2d 566 (2011).

¶ 41    On March 17, 2011, the petitioner filed the instant *pro se* petition for postconviction relief, alleging: (1) actual innocence; (2) ineffective assistance of defense counsel based on counsel precluding him from testifying at trial and (3) ineffective assistance of appellate counsel for counsel's failure to raise the ineffective assistance of trial counsel claim on direct appeal.

¶ 42    In support, the petitioner attached his own affidavit averring that if called to testify at his trial he would have stated that on July 24, 2005, he and his "two associates" Uriarte and Carden were socializing on the 4800 block of South Loomis Boulevard when they heard gunshots and

saw people "running in different directions." The petitioner and his friends could not determine who was shooting or from where the shots were coming because they ended abruptly. Afterwards, unaware that anyone had been shot, the petitioner and his friends were looking around the general area when the petitioner "spotted a gun on the ground." Although at first hesitant, the petitioner ultimately decided to pick it up. As the petitioner and his associates were discussing where the gun came from, whether it was the gun that the shots had come from and whether it was wise for the petitioner to keep it or sell it, they were suddenly apprehended by the police. The petitioner attested that he did not know who discarded the weapon, who used it, or who shot and killed the victim in the instant case.

¶ 43    After the circuit court advanced the petition to the second stage of postconviction proceedings, appointed counsel amended the petition on January 9, 2019. The amended petition alleged that after the petitioner was arrested together with Uriarte and Cardena, defense counsel Monaco arrived at the police station to represent Uriarte, after which both Uriarte and Cardena were released, and the petitioner was charged with the victim's murder. Thereafter, Monaco was hired to represent the petitioner during his trial. Monaco subsequently represented Cardena in an unrelated matter, while at the same time representing the petitioner. The amended petition therefore alleged that Monaco's prior representation of Uriarte and his concurrent representation or Cardena violated the petitioner's Sixth Amendment right to conflict-free representation.

¶ 44    In addition, the amended petition alleged that Monaco's failure to investigate, to call as witnesses and to attempt to implicate Uriarte and Cardena as the shooters at the petitioner's trial constituted ineffective representation. Specifically, the amended petition pointed out that Uriarte and Cardena both matched the description of the shooter, as they were both bald, and of the three Uriarte could best be described as "a little chunky," as Michael had described the shooter. In

11

addition, both Uriarte and Cardena were City Knights gang members. The amended petition further alleged that Uriarte and Cardena were "notorious criminals" involved in a massive criminal organization, which included members of both the Mexican cartel and the Chicago Police Department, and therefore had the power to command the petitioner to take the gun for them.

¶ 45     In support of these claims, the amended petition attached numerous documents including, *inter alia*: (1) a general progress report (GPR) of the Chicago Police Department detailing Monaco's arrival at the police station to represent Uriarte upon his arrest; (2) documents showing Monaco's representation of Cardena on two separate and unrelated matters, one during the petitioner's trial; (2) the petitioner's complaint to the Illinois Attorney and Disciplinary Commission (ARDC), filed immediately after his conviction, alleging, that Monaco had labored under a conflict of interest and failed to call two witnesses on his behalf, one of whom he represented in an unrelated matter during the petitioner's trial; (3) an April 30, 2008, letter from attorney Thomas Moore to the petitioner indicating that he was hired by Uriarte's brother, Hector Uriarte (Hector) to represent the petitioner on appeal; (3) police reports indicating that Uriarte and Cardena were both City Knights gang members; (4) photographs of the lineup viewed by Erik, including Uriarte, Cardena and the petitioner, showing that of the three Uriarte was the most "chunky"; (5) photographs of Uriarte's City Knights gang tattoos; (6) a 2011 federal district decision from the Northern District of Illinois granting the federal prosecutors motion to disqualify Monaco from representing Uriarte's brother Hector in a separate 2009 federal criminal prosecution, in which the government charged, among others, Uriarte and Cardena, with conspiring to commit "racketeering, kidnapping and other drug trafficking" offenses, which found that Monaco had previously represented Hector and many of his codefendants for the past

12

12 years; (6) Uriarte's indictment for conspiracy in that 2009 case in the Northern District of Illinois, which details the vastness of the conspiracy and the individuals involved; and (7) the Seventh Circuit's affirmance of Uriarte's and Cardena's convictions in that criminal conspiracy case, detailing their use of violence and threats of violence to silence witnesses, victims and others.

¶ 46    The State filed a motion to dismiss the amended petition arguing that the petitioner's claims were insufficient as a matter of law to establish a substantial violation of his constitutional rights. First, the State argued that the petitioner failed to make a substantial showing of a *per se* conflict of interest where the relationship between the petitioner, Uriarte, and Cardena did not fall into any of the three categories of *per se* conflict of interest recognized by our supreme court. In addition, the State argued that the petitioner failed to make a substantial showing of an actual conflict of interest where: (1) Uriarte and Cardena were never charged and were therefore never codefendants in the instant case; and (2) the petitioner failed to establish a plausible defense strategy casting Uriarte and Cardena as alterative suspects much less a strategy employed due to a conflict of interest.

¶ 47    In response to the State's motion to dismiss, the petitioner conceded that trial counsel's representation of Uriarte and Cardena was not a *per se* conflict of interest, as the Illinois Supreme Court limits such conflicts to three categories and "trial counsel's representation *** does not fall into any of these categories." The petitioner nonetheless continued to argue that counsel labored under an actual conflict of interest because Erik's testimony indicated that he changed his statement to Detective Rose that the shooter was wearing dark clothing, when he realized that "it implicated two dangerous men." The petitioner again cited to Uriarte's 2009

13

federal indictment as evidence that Uriarte used "threats" and "violence" to silence witnesses.

¶ 48    On March 29, 2021, after hearing arguments by the parties, the circuit court dismissed the amended petition. The petitioner now appeals.

¶ 49                                        III. ANALYSIS

¶ 50    On appeal, the petitioner contends that the circuit court erred in dismissing his petition at the second stage of postconviction review where he made a substantial showing that his counsel labored under a conflict of interest and provided him with ineffective assistance. For the following reasons, we agree.

¶ 51    At the outset, we set forth the well-established principles regarding postconviction proceedings. The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)) provides a means by which a criminal petitioner can assert that his conviction was a result of a substantial deprivation of his constitutional rights under either the United States or Illinois constitutions. *People v. Tate*, 2012 IL 11214, ¶ 8; see also *People v. Hodges*, 234 Ill. 2d 1, 9 (2009); *People v. Peeples*, 205 Ill. 2d 480, 509 (2002). A postconviction proceeding is not an appeal from the judgment of conviction but is a collateral attack on the trial court proceedings. *Tate*, 2012 IL 11214, ¶ 8. Accordingly, issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised but were not, are forfeited. *Id.*, ¶ 8.

¶ 52    A postconviction proceeding consists of three stages. *Tate*, 2012 IL 11214, ¶ 9. At the first stage, the circuit court must independently review the petition, taking the allegations as true, and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122–2.1(a)(2) (West 2010); see also *People v. Pingelton*, 2022 IL 127680, ¶ 32. A petition is frivolous or patently without merit only where it has no arguable basis either in fact or law. *People v. Domagala*, 2013 IL 11368, ¶ 32. If, just as here, the petition is not summarily dismissed at the

first stage, it advances to the second stage of postconviction proceedings.

¶ 53    At the second stage, an indigent petitioner may be appointed counsel to assist him in the proceedings and the State may file a motion to dismiss or answer the petition. *Pingelton*, 2022 IL 127680, ¶ 33; *Tate*, 2012 IL 112214, ¶ 10; *Domagala*, 2013 IL 113688 ¶ 33. In deciding a motion to dismiss at this stage, the circuit court must determine whether the petition and any accompanying documentation make " 'a substantial showing of a constitutional violation.' " *Tate*, 2012 IL 11214, ¶ 10 (quoting *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)); see also *Pingelton*, 2022 IL 127680, ¶ 33. In doing so, the court must not engage in fact-finding or credibility determinations but must take as true all well-pleaded facts that are not positively rebutted by the original trial record. See *Domagala*, 2013 IL 11368, ¶ 35 ("Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or 'show' a constitutional violation."). In other words, the second stage of postconviction review tests the legal sufficiency of the petition's well-pleaded allegations. *Id*. Where no substantial showing of a constitutional violation is made, the petition is dismissed. *Pingelton*, 2022 IL 127680, ¶ 34. If, however, a substantial showing of a constitutional violation is set forth, the petition must be advanced to the third stage of postconviction proceedings for the circuit court to conduct an evidentiary hearing. *Id.* Our review of the circuit court's second-stage dismissal of a postconviction petition is *de novo. Tate*, 2012 IL 11214, ¶ 10. *De novo* consideration means that we will perform the same analysis that would have been performed by the trial judge. *People v. Van Dyke*, 2020 IL App (1st) 191384, ¶ 41.

¶ 54    Both the United States and Illinois constitution guarantee criminal defendants the right to effective representation of counsel. *People v. Hale*, 2013 IL 113140, ¶ 15 (citing U.S. Cont., amends VI, XIV, and Ill. Const. 1970, art. I, § 8). It is axiomatic that to determine whether a

defendant was denied his right to such representation a reviewing court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Rodriguez*, 2018 IL App (1st) 160030, ¶ 48; see also *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)). Under this test, the defendant must prove both: (1) that his counsel's performance was deficient, *i.e.,* that counsel's actions constituted errors so serious as to fall below an objective standard of reasonableness; and (2) that counsel's deficient performance was prejudicial, *i.e.*, that absent the errors committed by counsel there was a reasonable probability that the outcome of his trial would have been different. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687).

¶ 55    "A criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation." *People v. Taylor*, 237 Ill. 2d 356, 374 (2010); *People v. Yost*, 2021 IL 126187, ¶ 36. Counsel is deemed constitutionally ineffective where his allegiance is " 'diluted by conflicting interests or inconsistent obligations.' " *Yost*, 2021 IL 126187, ¶ 36 (quoting *People v. Spreitzer*, 123 Ill. 2d 1, 14-15 (1988)). A party asserting that counsel operated under a conflict of interest is essentially "arguing that [such a] conflict rendered his attorney's performance substandard, and that the substandard performance caused prejudice." *Yost*, 2021 IL 126187, ¶ 36.

¶ 56    Unlike other jurisdictions, Illinois recognizes two types of conflicts of interest: *per se* and actual. *Yost*, 2021 IL 126187, ¶ 37; *Spreitzer*, 123 Ill. 2d at 14 (noting that "the term *per se* conflict does not appear in United States Supreme Court case law *** or in cases from our sister jurisdictions.")

¶ 57    A *per se* conflict arises when certain facts about the defense attorney's status, by themselves, create a disabling conflict. *People v. Green*, 2020 IL 125005, ¶ 22. Generally, this

occurs when the attorney has or had "a tie to a person or entity" that would benefit from a verdict unfavorable to the client. *Spreitzer*, 123 Ill. 2d at 16. Pursuant to long-standing precedent, our supreme court recognizes only three situations in which such a conflict can exist:

> "(1) when defense counsel has a prior or contemporaneous association with the victim, the prosecution or an entity assisting the prosecution [citations]; (2) when defense counsel contemporaneously represents a prosecution witness [citations]; and (3) when defense counsel was a former prosecutor who had been personally involved in the prosecution of the defendant [citation.]" *People v. Hernandez*, 231 Ill. 2d 134, 143-44 (2008); *accord People v. Fields*, 2012 IL 112438, ¶ 18; *Green*, 2020 IL 125005, ¶ 43; *In re Br. M.*, 2021 IL 125969, ¶ 45.

¶ 58 Because in this "closed set" of situations, the tie "may have subtle or subliminal effects on counsel's performance that are difficult to detect and demonstrate," (*In re Br. M.*, 2021 IL 125969, ¶ 55), a defendant alleging a *per se* conflict of interest need not establish that the conflict affected his performance. *People. v Hillenbrand*, 121 Ill. 2d 537, 544 (1988). Accordingly, where a *per se* conflict exists, for purposes of *Strickland* prejudice is presumed. See *Green*, 2020 IL 125005, ¶ 21 (" 'allegations and proof of prejudice are unnecessary in cases where a defense counsel *** might be restrained in fully representing the defendant's interest due to *** commitments to others' ") (quoting *People v. Coslet*, 67 Ill. 2d 127, 133 (1977); see also *Hernandez*, 231 Ill. 2d at 142-43. Unless a defendant waives his right to conflict-free representation, the remedy for a *per se* conflict of interest is automatic reversal. *Green*, 2020 IL 125005, ¶ 24.

¶ 59 In contrast, to establish an actual conflict of interest, a defendant must identify an actual conflict that adversely affected his counsel's performance. *Yost*, 2021 IL 126187, ¶ 38; see also

*Hernandez*, 231 Ill. 2d at 144. To do so, the defendant must "identify a specific deficiency in his counsel's strategy, tactics, or decision making that is attributable to the alleged conflict." *Yost*, 2021 IL 126187, ¶ 38. In this respect, "[s]peculative allegations and conclusory statements are insufficient." *Id.*; see also *Hernandez*, 231 Ill. 2d at 144. *People v. Morales*, 209 Ill. 2d 340, 349 (2004). Nonetheless, the defendant need not prove that the conflict contributed to his conviction. *Taylor*, 237 Ill. 2d at 375. Rather, he must only show that it adversely affected his lawyer's performance. *Id.* To do so, a defendant:

> " '[f]irst, *** must demonstrate that some plausible alternative defense strategy or tactic
> might have been pursued. He need not show that the defense would necessarily have been
> successful if it had been used, but that it possessed sufficient substance to be a viable
> alternative. Second, he must establish that the alternative defense was inherently in
> conflict with or not undertaken due to the attorney's other loyalties or interests.' " *People
> v. Nelson*, 2017 IL 120198, ¶ 37 (quoting *United States v. Fahey*, 769 F. 2d829, 836 (1st
> Cir. 1985)).

If the defendant can establish that counsel's actual conflict adversely affected his performance, he need not prove prejudice for purposes of *Strickland*. See *Cuyler v. Sullivan*, 466 U.S. 335, 349-359 (1980).

¶ 60    In the present case, the petitioner argues that Monaco labored both under a *per se* and an actual conflict of interest. For the following reasons, we find that the petitioner has only made a substantial showing of an actual conflict.

¶ 61                          A. *Per se* Conflict of Interest

¶ 62    With respect to a *per se* conflict of interest, on appeal, the petitioner contends that Monaco had "ties" to Uriarte and Cardena and that both men benefited from the petitioner's

18

charge and conviction for murder. The petitioner concedes that he waived this argument for purposes of appeal because in his response to the State's motion to dismiss his petition, he conceded that Monaco's actions did not fall into one of the three categories of *per se* conflicts recognized by our supreme court. The petitioner nonetheless asserts that since then, this appellate court has decided *People v. Soto and Ayala*, 2022 IL App (1st) 192484, which applied the *per se* conflict rule to a situation where trial counsel represented an alternative suspect.

¶ 63    The State argues that the petitioner misconstrues *Soto* and that the only reason the *per se* rule applied in that case was because defense counsel represented an alternative suspect who was also a named State's witness, which is not what occurred here. For the following reasons, we agree with the State.

¶ 64    In *Soto*, two codefendants, Soto and Ayala, were tried jointly before a single jury and convicted of two murders, attempted murder and conspiracy to commit murder. *Soto*, 2022 IL App (1st) 192484, ¶ 2. The State alleged through it primary witness, Wally Cruz, that Ayala had ordered a gang hit and that Cruz drove, among others, Soto, armed with a handgun, to a park where Soto fired and killed two people and injured another. *Id*. Soto and Ayala alleged that defense counsel had a *per se* conflict of interest because in the wake of the shooting for 19 days he simultaneously represented an "alternate suspect," Rodriguez, a 16-year-old, who was identified by several eyewitnesses as the person who fired the handgun into the park. *Id*. ¶¶ 3, 51. The State argued that because Rodriguez never testified at the defendants' trial, the *per se* conflict rule did not apply. *Id*. ¶¶ 120, 124.

¶ 65    On appeal, this court rejected the State's argument and held that the contemporaneous representation of an "alternate suspect," who was also a named State's witness in the defendants' case, created a sufficient potential conflict so as to fall under the *per se* conflict rule. *Id*. In doing

so, we explicitly rejected the State's contention that no *per se* conflict can ever arise where a named State's witness does not testify at trial. *Id.* ¶ 124. Instead, we held that Rodriguez's status as a disclosed State's witness in the defendants' case was sufficient to satisfy the second *per se* conflict of interest category. *Id.*

¶ 66    Contrary to *Soto*, in the present case, the petitioner himself concedes in his reply brief that he cannot show that Uriarte or Cardena were named witnesses in the State's case against him and that his only basis for seeking relief under the *per se* conflict rule is that Uriarte and Cardena were "alternate suspects." Under these circumstances, we have no choice but to conclude that *Soto* does not support the petitioner's contention that defense counsel Monaco labored under a *per se* conflict of interest.

¶ 67    To the extent that the petitioner relies on *Soto* for the proposition that a new category of *per se* conflict arises whenever defense counsel represents "alternate suspects" to a crime, we reiterate that our supreme court has repeatedly and categorically refused to expand *per se* conflicts of interest beyond the three categories it currently recognizes. See *Fields*, 2012 IL 112438, ¶ 40-41 (holding that the appellate court misinterpreted the statement that "[w]hen a defendant's attorney has a tie to a person or entity that would benefit from an unfavorable verdict for the defendant, a *per se* conflict arises" as setting forth an alternate fourth basis for *per se* conflicts of interest; reiterating that "[p]ursuant to long-standing precedent" the Illinois Supreme Court recognizes only "three situations where a *per se* conflict of interest exists."); *Green*, 2020 IL 125005, ¶ 37, 42-43 (rejecting the defendant's invitation to expand the *per se* conflict rule to include defense counsel's previous representation not of the actual victim, but of the intended victim of the defendant's crime; holding that "[i]n the event any confusion remains, we reiterate that this court recognizes only three situations in which a *per se* conflict of interest will be found

to exist.") *In re Br. M.*, 2021 IL 125969, ¶ 54-55, 60 (reversing the appellate court's decision applying the *per se* conflict rule to an attorney who represented a mother in a termination of parental rights proceeding for also serving as the guardian *ad litem* of the mother's child during three hearings on a neglect petition; noting, "As we recently reiterated, 'this court recognizes only three situations in which a *per se* conflict of interest will be found to exist.' That is a closed set, and any other situations may be examined for an actual conflict of interest." (Internal citations omitted.))

¶ 68    What is more, such an argument is contrary to our supreme court's long-standing rule that "joint representation of criminal codefendants is not *per se* violative of the constitutional guarantee of conflict-free representation." *Taylor*, 237 Ill. 2d at 375 (citing *People v. Vriner*, 74 Ill. 2d 329, 340 (1978) (although there is always the possibility that the interest of the codefendants may diverge, a conflict of interest is not inherent in joint-representation situations merely by virtue of such representation)); see also *People v. Sims*, 322 Ill. App. 3d 397, 414 (2001) ("The contemporaneous representation of a defendant and of another suspect in the same investigation that led to that defendant's arrest does not present a blatantly obvious conflict. It is not a representation of directly opposed interests that must inevitably collide—that is, the kind of competing interests that give rise to a conflict *per se*. While the potential for conflicts certainly exists, the interest of a defendant and of another suspect can often remain entirely compatible. *** There is no reason to presume from the very nature of the interests represented that counsel's allegiance to one of the other clients will suffer 'subluminal' impairment."). Since a conflict of interest is not inherent in a defense counsel's representation of codefendants charged in the same crime, such representation of uncharged "alternate suspects" similarly cannot give rise to a *per se* conflict of interest. Accordingly, we find that the petitioner has not made a substantial showing

of a *per se* conflict.

¶ 69                                    B. Actual Conflict of Interest

¶ 70    Nonetheless, for reasons that shall be more fully articulated below, we find that the petitioner has made a substantial showing of counsel's actual conflict of interest.

¶ 71    As already noted above, a defendant alleging an actual conflict of interest must demonstrate that: (1) some plausible alternative defense strategy or tactic might have been pursued; and (2) the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests. *Nelson*, 2017 IL 120198, ¶ 37. Under the first prong, a defendant need not show that the alternative defense strategy would have been successful had it been used but rather only that it "possessed sufficient substance to be a viable alternative." *Id.*

¶ 72    In the present case, taking as we must the petitioner's well-pleaded allegations as true, we find that the petitioner has made a substantial showing of a viable alternative strategy, *i.e.*, showcasing Uriarte and Cardena as the actual shooters. In addition, he has shown that the strategy was not pursued by Monaco because it was not undertaken due to his loyalties to Uriarte and Cardena.

¶ 73    Uriarte and Cardena were alternate suspects to possible murder charges in this case, and therefore undoubtedly stood to benefit from the petitioner's conviction. While the petitioner was arrested in possession of the murder weapon, gunpowder residue testing of his hands and clothing revealed that he did not discharge a firearm. Moreover, no one identified the petitioner as the shooter, and the petitioner was not observed with a firearm either immediately prior to or after the shooting. On the other hand, Uriarte and Cardena were both arrested on the night of the shooting after fleeing the scene. Their physical descriptions matched that of the petitioner, and they were affiliated with the same gang as the petitioner. That gang was further identified as the

motive behind the shooting. Moreover, in his amended petition, the petitioner introduced evidence suggesting that Uriarte and Cardena were high ranking members of an extensive criminal enterprise with the ability to coerce witness testimony and command the petitioner to take the gun from them after the shooting. Accordingly, a plausible argument could be made that either Uriarte or Cardena shot the victim and disposed of the weapon by giving it to the petitioner.

¶ 74     The State nonetheless asserts that Monaco made a strategic decision not to introduce any evidence implicating Cardena and Uriarte because he deemed them not to be viable alternative suspects. In this respect, the State asserts that the evidence at the petitioner's trial unequivocally established that the shooter wore white, while Cardena and Uriarte wore dark clothing upon their arrest. We disagree.

¶ 75     Eyewitness testimony from the petitioner's trial by no means excluded the possibility that the shooter wore dark clothing. While Mitchell and Michael initially testified that the shooter wore white, on cross-examination, Michael admitted that he did not know if the person in white "actually was the one who shot." He admitted that he "couldn't see north or south of the lot" and therefore did not know whether there was another shooter nearby. Mitchell similarly testified that at one point, he lost sight of the man in the white shirt and was therefore not certain if he was the one who later fired the shots. The third eyewitness, Erik, similarly acknowledged on cross-examination that he could not remember whether the shooter wore dark or light clothing. In addition, Erik later viewed a lineup containing the petitioner but made no identification. Under this record, we cannot conceive of a strategic reason for counsel's failure to attempt to implicate Uriarte and Cardena as alternative suspects.

¶ 76     In this respect, we disagree with the State's position that the record affirmatively shows

23

that Monaco initially intended to implicate Uriarte and Cardena but changed course mid-trial after Erik's testimony. According to the State, because Erik testified on cross-examination that he could not remember telling Detective Rose that the shooter was "possibly wearing dark clothing," Detective Rose's rebuttal testimony about what Erik told him could only be used for impeachment and not as substantive evidence. The State asserts that Monaco realized this after the trial court sustained the State's objection to his closing argument regarding Erik not knowing whether the shooter wore dark or light clothing.

¶ 77    Contrary to the State's characterization, the objection regarding Erik's testimony being used as substantive evidence came at the end of Monaco's closing argument, and not mid-way so as to have impacted counsel's strategy. More importantly, nothing in the record affirmatively establishes that Monaco ever intended to implicate Cardena and Uriarte since neither appeared on defense counsel's witness list. Moreover, during his case-in-chief, defense counsel, in no meaningful way attempted to introduce evidence regarding Cardena's and Uriarte's gang affiliation, or their motive to kill the victim, let alone their ability to coerce the petitioner to take the gun for them. Throughout his opening and closing arguments, Monaco consistently attacked the State's case based on a lack of identification, no forensic evidence establishing that the petitioner had fired a gun, and the eyewitnesses' inability to observe the shooter. The record therefore does not positively establish that Monaco abandoned the petitioner's proposed alternative trial strategy.

¶ 78    The State nevertheless further asserts that Uriarte and Cardena were not viable alternate suspects because the petitioner has failed to present evidence that they had the ability to coerce him into taking the gun from them after the shooting. The State contends that without such evidence the petitioner could not prove that Uriarte and Cardena had any more reason than he did

to commit the shooting. In this respect, the State argues that the 2006 federal racketeering and conspiracy indictment against Uriarte and Cardena and the 2016 Seventh Circuit Court of Appeals decision detailing Uriarte's and Cardena's crimes do not explicitly refer either to their gang affiliation or to their rank, nor in any way establish that they had the ability command the petitioner to perform any acts on their behalf.

¶ 79    For the following reasons, we disagree and find that regardless of whether Uriarte and Cardena had such power over the petitioner, they were viable alternative suspects that should have been implicated at the petitioner's trial.

¶ 80    At the outset, we note that, contrary to the State's position, the documents attached to the amended petition make a substantial showing that Uriarte and Cardena had the ability to coerce and intimidate witnesses. Uriarte's and Cardena's federal indictment and the Seventh Circuit Court of Appeals decision affirming their convictions both establish the existence of a decade-long criminal conspiracy involving, among others, Chicago police officer Glen Lewellen and 13 other individuals, including, Cardena, Uriarte, and Uriarte's brother, Hector. According to these documents, beginning in 1998, the members of this conspiracy, who were initially police informants, identified and robbed drug dealers for their own gain. *United States v. Cardena*, 842 F.3d 959 (7th Cir. 2006). For the next ten years, they committed at least three murders, twenty kidnappings and robberies and numerous drug-trafficking offenses, until they were arrested in 2009, when the Drug Enforcement Agency (DEA) filmed them attempting to rob 600 kilograms of cocaine from a warehouse. *Id*.

¶ 81    One of the incidents described in the Seventh Circuit decision notes that in 2006 Uriarte and Cardena broke into a warehouse in Joliet and stole 300 kilograms of cocaine. *Id.* After discovering that the cocaine belonged to a high-ranking member of the Mexican cartel, Uriarte's

25

coconspirators blamed the robbery on two drug-dealers. The coconspirators were subsequently hired by the Mexican cartel to investigate the robbery, after which Uriarte kidnapped and tortured the two drug-dealers on behalf of the Mexican cartel. *Id.*

¶ 82    Another incident described in the Seventh Circuit decision notes that in 2007, among others, Uriarte impersonated a police officer and using a battering ram, entered the home of a victim whom he believed had $2 million in his home, after which he threatened the victim and his wife and children until they gave him the money.

¶ 83    In addition, the 2009 federal indictment against Uriarte and Cardena repeatedly alleges that the coconspirators used violence, intimidation, and threats to achieve their gains. Specifically, describing the purpose of the criminal enterprise, the indictment notes that "the leaders, members and associates of the enterprise undertook steps necessary to prevent the detection of their criminal activities, and sought to prevent and resolve the imposition of any criminal liabilities upon their leaders, members and associates by the use of violence and intimidation directed against victims, witnesses and others."

¶ 84    Accordingly, while the State is correct that the documents attached to the petition do not explicitly refer to Uriarte's or Cardena's gang affiliation or rank, or their relationship to the petitioner, it is undeniable that they present evidence that Uriarte and Cardena were violent men, who operated a lucrative criminal enterprise that involved both members of the Chicago Police Department and the Mexican Cartel, and therefore had the ability to intimidate, coerce and command others to do their bidding.

¶ 85    Moreover, regardless of their ability to command the petitioner to take the fall for them, Uriarte and Cardena were viable alternative suspects that should have been introduced at trial. As already noted above, to show that counsel had an actual conflict of interest, the petitioner need

not show that his proposed alternative strategy would have been successful had it been used but rather only that it "possessed sufficient substance to be a viable alternative." *Nelson*, 2017 IL 120198, ¶ 37. In the instant case, the evidence against the petitioner was circumstantial. No one identified him as the shooter and the eyewitnesses could barely agree on whether the shooter wore white. Moreover, at least one eyewitness conceded that he did not know whether there were other shooters in the area because his view of the area was blocked by the surrounding buildings. The one thing that the three eyewitnesses could agree upon, however, was that they heard someone yell "City Knight La Raza killer" immediately before the shooting. Where the evidence pointed to a gang-related motive, defense counsel Monaco should have highlighted evidence of Uriarte's and Cardena's membership in the City Knights (by way of photographs of Uriarte's gang tattoos and the Major Incident Report listing Cardena's gang affiliation as City Knights) to present them as equally viable suspects. Counsel also should have introduced evidence of Uriarte's and Cardena's physical descriptions as they matched that of the petitioner. Furthermore, counsel should have argued that of the three suspects, Uriarte best fit Michael's description of the shooter as "a little chunky." By not doing so, counsel left the petitioner as the only person in the jury's eyes who had reason to commit the crime.

¶ 86    The State, nonetheless, asserts that even if the petitioner can show that Uriarte and Cardena were viable alternative suspects, he cannot establish that Monaco's decision not to call them as witnesses or implicate them in the shooting arose from any loyalty towards them. In this respect, the State argues that the petitioner cannot even show that counsel knew about Uriarte's and Cardena's crimes at the time of his trial in 2007. We disagree.

¶ 87    The documents addressed above clearly establish that Uriarte and Cardena ran their criminal enterprise between 1998 and 2009, which encompasses the time when Monaco

represented the petitioner. In addition, the attached 2011 federal district court decision (from the Northern District of Illinois) disqualifying Monaco as Hector's attorney in the federal conspiracy and racketeering case, establishes that by 2011 Monaco had represented Hector and "several of his codefendants" (which would have included Uriarte and Cardena) for over 12 years and "owe[d] continuing duties of confidentiality and loyalty to those former clients."

¶ 88     The GPR, attached to the petition, further establishes that at the time of the petitioner's arrest, prior to taking on the petitioner's case, Monaco initially arrived at the police station to represent Uriarte, while other attorneys arrived for the petitioner and Cardena. It was only after Uriarte and Cardena were released that Monaco began representing the petitioner. What is more, it is undisputed that while representing the petitioner, Monaco contemporaneously represented Cardena on an unrelated murder charge.

¶ 89     Under these circumstances, taking as true the well-pleaded allegations in the petition, we cannot conclude, as a matter of law, that in 2007, Monaco was unaware of Cardena's and Uriarte's gang status, so as not to have been able to use this information at the petitioner's trial.

¶ 90     Moreover, the retainer letter from the petitioner's subsequently hired appellate counsel, Thomas Moore, dated 2008, instructing the petitioner that Moore has been hired by Urirate's brother, Hector, to represent him on appeal, further supports the petitioner's position that as members of the criminal enterprise, Urirate and Cardena, "prevent[ed] and resolv[ed] the imposition of any criminal liabilities upon their leaders, members and associates."

¶ 91     For these reasons, we reject the State's strategic justifications for Monaco's failure to implicate Uriarte and Cardena in the shooting and conclude that they do not defeat the more probable inference: that Monaco could not call Uriarte or Cardena as witnesses, or use information known to him about their criminal activities, without betraying his duty of loyalty to

28

them or disclosing information that Uriarte and Cadena had shared with him under the cloak of attorney-client privilege. To the extent that the State wishes to probe Monaco's "motivations or trial strategy," we reiterate that "the appropriate venue to do so is at a third-stage evidentiary hearing." *Soto*, 2022 IL App (1st) 192484, ¶ 128; see also *Domagala*, 2013 IL 113688, ¶ 34; *People v. Gacho*, 2012 IL App (1st) 091675, ¶ 32 (holding that a postconviction petitioner made a substantial showing that defense counsel labored under an impermissible conflict of interest when he represented a murder victim's family member even though he did not indicate the nature of counsel's representation of that family member; remanding for a third-stage evidentiary hearing but declining to resolve the questions of "what effect an actual conflict might have had on the defendant's trial" because "the evidence adduced at any such hearing may affect the strength of defendant's allegations in unforeseeable ways"); see also *People v. Boswell*, 2020 IL App (4th) 180165, ¶ 28 (holding that the defendant was entitled to a third-stage evidentiary hearing on his conflict of interest claim where defendant made a substantial showing that trial counsel labored under an actual conflict of interest).

¶ 92    Accordingly, we conclude that the circuit court erred in dismissing the petitioner's actual conflict of interest claim.

¶ 93                    C. Ineffective Assistance of Counsel

¶ 94    For these same reasons, we further find that the circuit court erred in dismissing the petitioner's ineffective assistance of counsel claim.

¶ 95    As already noted above, claims of ineffective assistance are governed by the two-prong standard set forth in *Strickland*. See *Rodriguez*, 2018 IL App (1st) 160030, ¶ 48; *Colon*, 225 Ill. 2d at 135 (citing *Albanese*, 104 Ill. 2d 504). To prevail on such a claim, the petitioner was required to substantially show both: (1) that counsel's performance was objectively deficient

under prevailing professional norms and (2) that this deficient performance prejudiced the petitioner. *Domagala*, 2013 IL 11368, ¶ 36.

¶ 96    To establish deficient performance, the petitioner had to "overcome the strong presumption that counsel's *** inaction was the result of sound trial strategy. *People v. Anderson*, 2013 IL App (2d) 111183, ¶ 54. While typically counsel's decisions regarding which witness to present are considered matters of trial strategy, such strategic decisions "may be made only after there has been a 'thorough investigation of law and facts relevant to plausible options.' " *People v. Gibson*, 244 Ill. App. 3d 700, 703-704 (1993). Trial counsel has a professional duty to conduct "reasonable investigations or to make reasonable decisions that make[] particular investigations unnecessary." *Domagala*, 2013 IL 113688, ¶ 38. As such, our courts have repeatedly held that an attorney's failure to investigate witnesses may constitute objectively unreasonable assistance. See *e.g.*, *People v. Bolden*, 2014 IL App (1st) 123527, ¶ 38 (holding that defense counsel's failure to investigate and contact alibi witnesses constituted objectively unreasonable assistance); *Hodges*, 234 Ill. 2d at 20-21 (holding that counsel's failure to investigate and call three witnesses who would have testified that they observed an individual take a gun from the victim's body after the defendant shot him, was objectively unreasonable, as it would have supported the defendant's theory of defense, *i.e.* a finding of guilt on second degree murder based on an unreasonable belief that deadly force was necessary).

¶ 97    Moreover, even where counsel conducts a thorough investigation, failure to present exculpatory evidence of which he is aware is objectively unreasonable. See e.g., *People v. King*, 316 Ill. App. 3d 901, 913-16 (2000) ("[C]ounsel's tactical decisions may be deemed ineffective when they result in counsel's failure to present exculpatory evidence of which he is aware[.]"); see also *People v. Bass*, 2022 IL App (1st) 210249, ¶ 30 ("Where a defendant's attorney is aware

of exculpatory evidence and does not present it, counsel can be deemed ineffective.")

¶ 98    In the present case, as already noted above, the record as developed up to this point in the proceedings reflects no strategic reason for defense counsel's failure to interview, subpoena, call or implicate Uriarte and Cardena as witnesses at the petitioner's trial. Had he done so counsel would have certainly discovered that they were present during the shooting, were City Knights gang members, matched the descriptions of the shooter, had the motive and opportunity to kill the victim and the ability to coerce the petitioner to take the fall for them.

¶ 99    Moreover, in light of the weak and circumstantial evidence of the petitioner's guilt, there is more than a reasonable probability that but for counsel's failure to investigate, call and or implicate these witnesses, the outcome of the petitioner's trial would have been different. See *Colon*, 225 Ill. 2d at 135 (to establish prejudice under *Strickland* the petitioner must show that "but for" counsel's deficient performance, there was a reasonable probability that the result of his proceedings would have been different); see also *People v. Evans*, 209 Ill. 2d 194, 220 (2004) ("[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way that counsel's deficient performance rendered the result of the trial unreliable and fundamentally unfair.") Had the jury been presented with evidence showcasing Uriarte and Cardena as viable alternative suspects, it would have had a basis upon which to acquit the petitioner. See *People v. Makiel*, 358 Ill. App. 3d 102, 109 (2005) (holding that the defendant was entitled to an evidentiary hearing on his claim that counsel was ineffective for failing to subpoena the separately tried codefendant where questions of fact existed as to counsel's failure to investigate and whether failure to call this witness rendered his trial fundamentally unfair where the record reflected no strategic reason for counsel's failure to call the witness and questions of fact could only be resolved by consideration

of matters outside of the record); see also *People v. House*, 141 Ill. 2d 323, 386 (1990) (holding

that based on the closeness of the evidence, counsel's failure to conduct an investigation that

would have established that the victim described someone other than the defendant at the scene,

constituted ineffective assistance of counsel, which likely affected the outcome of the

defendant's trial); *People v. Coleman* 267 Ill. App. 3d 895, 899 (1994) (holding that counsel's

failure to interview witnesses and "pursue information in his possession," which indicated that

the crime had been committed differently from what the victim had reported supported the

defendant's claim of ineffective assistance of counsel).

¶ 100   We therefore conclude that the petitioner has made a substantial showing of ineffective

assistance of counsel for counsel's failure to investigate these witnesses and introduce

exculpatory evidence implicating them in the crime.

¶ 101                                      IV. CONCLUSION

¶ 102   In summary, we find that while the petitioner has not made a substantial showing of a *per se* conflict of interest, his petition sufficiently sets forth two claims that must be further explored

at an evidentiary hearing: (1) that counsel labored under an actual conflict of interest; and (2) that

counsel provided the petitioner with ineffective assistance by not investigating or implicating

Uriarte and Cardena as possible alternative shooters.

¶ 103   We therefore affirm the circuit court's decision dismissing the petitioner's *per se* conflict

of interest claim but reverse and remand for further proceedings under the Act on the petitioner's

actual conflict of interest and ineffective assistance of counsel claims.

¶ 104   Affirmed in part; reversed and remanded in part.